## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

LTD BROADBAND, LLC,

       Petitioner,

       v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

       Respondents.

Case No. 24-1017

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Federal Rule of Appellate Procedure 15(a), LTD Broadband, LLC ("LTD") hereby petitions the Court for review of the attached final order of the Federal Communications Commission, captioned *In re LTD Broadband, LLC*, Order on Review, WC Docket Nos. 10-90, 20-34, 19-126 (rel. Dec. 4, 2023) (FCC 23-103) ("Order"), and entered on December 4, 2023. *See* 47 C.F.R. § 1.4(b)(2); 47 U.S.C. § 405(a).

In the Order, the Commission denied LTD's application for review of a decision that denied LTD's application to be authorized to receive broadband deployment support from the Rural Digital Opportunity Fund Auction 904. LTD is therefore aggrieved by the Order, 28 U.S.C. § 2344, and venue lies in this Court, 28 U.S.C. § 2343. LTD asks that the Court hold the Order unlawful and set it aside

because the Order is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and otherwise contrary to law.  5 U.S.C. § 706.

Respectfully submitted,

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
Joshua S. Turner
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law

Stephen E. Coran
David S. Keir
**Lerman Senter PLLC**
2001 L Street NW | Suite 400 |
Washington, DC 20036
Tel: (202) 416-6744
scoran@lermansenter.com

*Counsel for Petitioner*

Dated: February 2, 2024

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, LTD Broadband, LLC states as follows:

LTD Broadband, LLC is a provider of high-speed broadband and voice services.  It has no parent company, and no publicly-held company has a 10% or greater ownership interest in LTD Broadband, LLC.

Respectfully Submitted,

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law

*Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I, Thomas M. Johnson, Jr., certify that on February 2, 2024, I caused this Petition to be served on the Circuit Clerk of this Court through the CM/ECF system. I further certify that I will serve a date- stamped copy of the Petition on the following counsel by the manner indicated:

*By Electronic Mail and Certified Mail*

P. Michele Ellison
General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
LitigationNotice@fcc.gov

*By Certified Mail*

Merrick B. Garland, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law

*Counsel for Petitioner*

# ATTACHMENT

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Application for Review of | ) | WC Docket No. 10-90 |
| | ) | |
| LTD Broadband, LLC | ) | WC Docket No. 20-34 |
| | ) | |
| Denial of Application for Rural Digital | ) | WC Docket No. 19-126 |
| Opportunity Fund/Auction 904 | ) | |

**ORDER ON REVIEW**

**Adopted: December 1, 2023**                    **Released: December 4, 2023**

By the Commission:

## I.    INTRODUCTION

1.      By this Order on Review, we deny an application for review submitted by LTD Broadband, LLC (LTD).[1]  LTD seeks review of a decision by the Wireline Competition Bureau (WCB or Bureau) that denied its application to be authorized to receive broadband deployment support from the Rural Digital Opportunity Fund (RDOF) Auction 904.[2]

## II.    BACKGROUND

2.      In January 2020, the Commission announced the Rural Digital Opportunity Fund auction, a multi-round, reverse, descending-clock auction that favored faster services with lower latency to ensure that the greatest possible number of Americans would be connected to the best possible networks, all at a competitive cost.[3]  Providers who could offer service at higher speeds and low latency could receive more funding to provide service in a given area.[4]  To reduce the burden on prospective auction participants while still ensuring that the providers who ultimately received support in a given area were able to provide the service they committed to offering, the Commission required auction participants to undergo a two-phased application process of a pre-auction "short-form application" and a post-auction "long-form application" for all winning bidders.[5]

---

[1] *See* Application for Review of LTD Broadband, LLC, WC Docket No. 10-90 (filed Sept. 8, 2022) (Application for Review).  We review applications for review of action taken on delegated authority pursuant to section 5(c)(4) of the Communications Act of 1934, as amended (Communications Act), 47 U.S.C. § 155(c)(4).

[2] *See Rural Digital Opportunity Fund Auction Support for 80 Winning Bids Ready to Be Authorized, Bid Defaults Announced*, AU Docket No. 20-34 et al., DA 22-848, at 8-11 (WCB/OEA Aug. 10, 2022) (*11th RDOF Ready to Authorize/Defaults Public Notice*).  See also Letter from Trent Harkrader, Chief, Wireline Competition Bureau, to Corey Hauer, CEO, LTD Broadband, LLC (Aug. 10, 2022) (Bureau Letter).  The August 10th Letter provided an in-depth explanation of the Bureau's decision.

[3] *Rural Digital Opportunity Fund et al.*, WC Docket No. 19-126 *et al.*, Report and Order, 35 FCC Rcd 686 (2020) (*Rural Digital Opportunity Fund Order*).

[4] *Id.* at 688, para. 5.

[5] *Id.* at 717-18, paras. 67-68.

3.     Before the auction began, all potential bidders were required to submit a "short-form application," which required the potential bidder "to establish its eligibility to participate in the auction by providing, among other things, basic ownership information and certifying to its qualifications to receive support."[6]  The review of short-form applications was meant to determine whether "the applicant has the legal, technical, and financial qualifications to participate in the" auction,[7] but the information required in the short-form application was "high-level," in recognition of the need to "balance[] the objectives of determining whether an applicant is expected to be reasonably capable of meeting the relevant performance requirements in the areas where it plans to bid with minimizing the burdens on applicants and Commission staff."[8]  For example, when submitting its short-form application, a prospective bidder was required to identify the states in which it intended to bid, but not the total number of locations within each state where it intended to bid.[9]

4.     After the completion of the auction, winning bidders were required to submit "long-form applications," which provided "extensive information detailing their respective qualifications…, allowing for a further in-depth review of their qualifications prior to authorization of support."[10]  Additionally, as part of the long-form application, winning bidders were required to demonstrate how they would provide the required service in the specific areas covered by their winning bids,[11] as opposed to the more general, high-level showing on the short-form application.[12]  Winning bidders were required to show that they were both financially and technically qualified; a failure to establish qualifications on either of those factors was grounds for denial of the long-form application.[13]

5.     Bureau staff conducted an in-depth review of long-form applications both for completeness and compliance with the Commission's rules *and* to determine whether an applicant was financially and technically qualified for support.[14]  If the Bureau could not make such a determination

---

[6] *Rural Digital Opportunity Fund Phase I Auction Scheduled for October 29, 2020; Notice and Filing Requirements and Other Procedures for Auction 904*, AU Docket No. 20-34 et al., Public Notice, 35 FCC Rcd 6077, 6098, para. 63 (2020) (*Auction 904 Procedures Public Notice*).

[7] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6088, para. 27 ("The short-form application is the first part of the Commission's two-phased auction application process.  In the first phase, eligibility to participate in the auction is based on an applicant's short-form application and certifications.").

[8] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6099, 6101, paras. 66, 71.  *See also id.* at 6124, para. 123 ("the information we collect at the short-form application stage is designed to determine at a high level, and based on the totality of circumstances and the information submitted in the application that the applicant has developed a reasonable preliminary design or business case for meeting the public interest obligations for its selected performance tier and latency combinations and is thus expected to be reasonably capable of meeting those public interest obligations").

[9] *Id.* at 6091, para. 41.

[10] *Rural Digital Opportunity Fund Order*, 35 FCC Rcd at 725, para. 86.

[11] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6167, para. 301.

[12] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6099, para. 66.  *See also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6100, para. 68 ("We expect it would be burdensome for applicants to provide enough detail at the short-form application stage and for Commission staff to review the information and make eligibility decisions for smaller areas than a state, particularly when the applicant may not know exactly where in a state it will bid, much less win support.  Such a review is better suited for the long-form application, where a long-form applicant is required to provide detailed network information *for the areas covered by its winning bids*.") (emphasis added).

[13] *See Rural Digital Opportunity Fund Order*, 35 FCC Rcd at 720-21, para. 77.

[14] *Id.* at 722, 725, paras. 79, 86 (noting that the long-form application process "will provide an in-depth extensive review of the winning bidders' qualifications" and that long-form applicants "are required to submit extensive information detailing their respective qualifications in their long-form applications, allowing for a further in-depth

(continued….)

after reviewing a long-form application, the Bureau notified the long-form applicant that additional information was required.[15]  If a long-form applicant was found ineligible or unqualified to receive support, the application was denied and the applicant was announced in default and subject to forfeiture.[16]

6.      An applicant was deemed technically and financially qualified for support if the Bureau determined, after evaluating the information submitted with the long-form application, that the "applicant [was] reasonably capable of meeting its RDOF auction obligations,"[17] with a particular focus on meeting the public interest obligations in the "specific areas" covered by the applicant's winning bids.[18]  The Commission also emphasized the importance of having "more information about exactly where [an] applicant will win support and how many locations it will serve" in making a determination regarding an applicant's ability to meet the public interest obligations.[19]  The Commission defined reasonably capable to mean meeting the Commission staff's "reasonable expectation" that the applicant would be able to meet the relevant public interest obligations in the areas where the applicant won support.[20]

7.      As in all Universal Service Fund (USF) auctions, the Commission made clear that the short-form and long-form applications would receive different levels of review relevant to the differing purposes of each application.  The Commission has been clear that in contrast to the more generalized, high-level review it gives to an applicant's qualifications in the short-form application, a long-form application review focuses specifically on whether a winning bidder has made a sufficient showing of its technical and financial ability to serve the specific areas where it won support.  Moreover, the

(Continued from previous page) ─────────────────

review of their qualifications prior to authorization of support").  *See also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6112, para. 97 (explaining the Commission's expectation that "the more in-depth long-form application process will further minimize the risk of authorizing an unqualified applicant"); *Rural Digital Opportunity Fund Phase I Auction (Auction 904) Closes; Winning Bidders Announced; FCC Form 683 Due January 29, 2021*, AU Docket No. 20-34 et al., Public Notice, 35 FCC Rcd 13888, 13895, para. 18 (2020) (*Auction 904 Closing Public Notice*) ("Timely submitted applications will be reviewed by Commission staff for completeness and compliance with the Commission's rules and to determine if the long-form applicant has demonstrated that it is technically and financially qualified to fulfill its Rural Digital Opportunity Fund public interest obligations if authorized to receive support.").

[15] *Auction 904 Closing Public Notice*, 35 FCC Rcd at 13895, para. 18 (explaining that the Commission "will notify a long-form applicant if additional information is required").  *See also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6168, para. 303 ("If a long-form applicant submits a technology and system design description that lacks sufficient detail to demonstrate that the long-form applicant has the technical qualifications to meet the relevant Rural Digital Opportunity Fund obligations, the long-form applicant will be asked to provide further details about its proposed network."); 47 CFR § 54.804(b)(viii) (requiring long-form applicants to submit "[s]uch additional information as the Commission may require").

[16] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6178, para. 321.  *See also id.* at 6116, para. 108 (noting "an applicant will be deemed in default if at the long-form application stage, Commission staff determines the applicant is not reasonably capable of meeting the public interest obligations associated with its winning bids"); *Rural Digital Opportunity Fund Order*, 35 FCC Rcd at 735, para. 114; *Auction 904 Closing Public Notice*, 35 FCC Rcd at 13895, para. 18 (explaining that "[i]f a long-form applicant ultimately fails to provide all the required information or demonstrate that it is technically and financially qualified, [the Bureau] will release a public notice identifying the applicant and the winning bids that are considered in default").

[17] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6098-99, para. 64.

[18] *Id.  See also id.* at 6124, para. 125 (noting the importance of having "more information about exactly where [an] applicant will win support and how many locations it will serve" in making a determination regarding an applicant's ability to meet the public interest obligations).  A long-form applicant is also required to certify it is "financially and technically qualified to meet the public interest obligations for Rural Digital Opportunity Fund support *in each area for which it seeks support*."  47 CFR § 54.804(b)(2)(ii) (emphasis added).

[19] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6124, para. 125.

[20] *Id.* at 6099, para. 64.

Commission has specifically explained that a "determination at the short-form stage that an applicant is eligible to bid for a performance tier and latency combination would not preclude a determination at the long-form application stage that an applicant does not meet the technical qualifications for the performance tier and latency combination and thus will not be authorized to receive Rural Digital Opportunity Fund support."[21]

8.      LTD timely submitted a short-form application and was announced as one of 386 bidders approved to participate in Auction 904.[22]  Auction 904 commenced on October 29, 2020.  In the first round of the auction, LTD bid to deploy gigabit service to 2,223,682 locations in 16 states, seeking $13,326,751,930 in 10-year support despite an existing small deployment footprint and subscriber base of approximately 15,000 customers.  At the conclusion of the auction after 19 rounds of bidding, LTD was the largest winning bidder in the auction, with winning bids to deploy gigabit speed low-latency service to 528,088 locations in 15 states with $1,320,920,719 in 10-year support.

9.      On December 7, 2020, WCB and the Office of Economics and Analytics (OEA) announced that there were 180 winning bidders in the RDOF auction and established the deadlines for winning bidders to submit their "long-form applications" for support.[23]  Winning bidders had the opportunity assign some or all of their winning bids to related entities by December 22, 2020.[24]  All winning bidders that retained their winning bids and all related entities that were assigned winning bids were required to submit long-form applications by January 29, 2021.[25]  LTD filed its timely long-form application for support on January 29, 2021, and submitted, among other items, an attachment with its detailed technology and system design description as required of all applicants by February 15, 2021.  On February 18, 2021, staff announced that there were 417 long-form applicants.[26]

10.      Auction 904 long-form applicants were required to certify that they are eligible telecommunications carriers (ETCs) in all bid areas and to submit appropriate documentation supporting such certification on or before June 7, 2021.[27]  LTD timely sought and received ETC designation in eight states (Colorado, Illinois, Indiana, Minnesota, Missouri, Ohio, Texas, and Wisconsin).  In the remaining seven states in which it had winning bids (California, Iowa, Kansas, Oklahoma, Nebraska, North Dakota, South Dakota), LTD filed a request for waiver of the June 7, 2021 deadline to submit ETC certifications

---

[21] *Id.  See also id.* at 6174-75, para. 312 ("A long-form applicant must also describe how the required construction will be funded in each state. The description should include the estimated project costs for all facilities that are required to complete the project, including the costs of upgrading, replacing, or otherwise modifying existing facilities to expand coverage or meet performance requirements. The estimated costs must be broken down to indicate the costs associated with each proposed service area at the state level and must specify how Rural Digital Opportunity Fund support and other funds, if applicable, will be used to complete the project. The description must include financial projections demonstrating that the long-form applicant can cover the necessary debt service payments over the life of any loans."); *see also id.* at 6100, para. 68.

[22] *386 Applicants Qualified to Bid in the Rural Digital Opportunity Fund Phase I Auction (Auction 904)*, AU Docket No. 20-34 et al., Public Notice, 35 FCC Rcd 11356 (WCB and OEA 2020).

[23] *Auction 904 Closing Public Notice,*  35 FCC Rcd 13888.

[24] *Id.* at 13890-91, paras. 9-14.

[25] *Id.* at 13892-93, para. 16.

[26] *417 Long-Form Applicants in the Rural Digital Opportunity Fund Phase I Auction (Auction 904)*, Public Notice, DA 21-170 (WCB and OEA Feb. 18, 2021) (*Auction 904 Long-Form Applicants Public Notice*).

[27] 47 CFR § 54.804(b)(5) (requiring winning bidders to submit within 180 days of the announcement of winning bids, a certification of ETC designation in all relevant areas and supporting documentation for that certification); *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6176, para. 316; *see also Rural Digital Opportunity Fund Order*, 35 FCC Rcd at 727-28, para. 92.

to the FCC.[28]  In two separate orders, the Bureau denied LTD's request for waiver of the ETC certification deadline for California, Kansas, Oklahoma, Iowa, Nebraska, and North Dakota.[29]  LTD subsequently defaulted on all winning bids in Kansas and Oklahoma and sought reconsideration of the waiver denials regarding California, Iowa, Nebraska, and North Dakota.[30]  Later, LTD withdrew its petition for reconsideration of the waiver denials in California and Iowa, thus defaulting on all bids in those two states.[31]

11.      In March 2021, June 2021, September 2021, and multiple times in March 2022, staff spoke with LTD about the financial and technical deficiencies that staff identified in LTD's long form application.  In these calls, staff explained the insufficiencies to LTD and answered LTD's questions regarding program requirements.  LTD did not submit revised financial information after its initial filings at the long-form application deadline.  On August 5, 2021, LTD submitted a revised technical description purporting to cover Arkansas, Louisiana, and Mississippi (states in which it did not place winning bids).  Even if assumed to apply to the fifteen states in which LTD did place winning bids, the revised documents did not sufficiently address the application technical deficiencies.  After the September 2021 staff call, LTD submitted another revised technical description in November 2021, but that revised version still indicated that it applied to Arkansas, Louisiana, and Mississippi, and it was still insufficient to show that LTD could meet the obligations associated with its winning bids.  Repeated contacts with LTD through March 2022 did not elicit additional financial or technical filings.  To conclude this process, staff sent a formal letter to LTD on May 26, 2022, extensively detailing the application's deficiencies and providing LTD a final opportunity to demonstrate its qualifications for support.  LTD's response was due by June 27, 2022.

12.      In response to that letter, on June 27, 2022, LTD submitted revised financial and technical attachments to explain its network deployment plans in 10 states (Colorado, Illinois, Indiana, Minnesota, Missouri, North Dakota, Ohio, South Dakota, Texas, and Wisconsin).  Furthermore, LTD identified that it had entered into two financial agreements on that same day to obtain additional funding and a source for future loaned funds, ostensibly to enhance its financial position and operational capabilities.  Subsequently, staff sought clarification from LTD as to why a technical or financial plan for Nebraska was not included in these revised materials.  LTD responded that it was still seeking RDOF support in Nebraska despite not including this state in its final financial and technical submissions.[32]  In sum, LTD proposed to deploy fiber to 475,616 estimated locations in 11 states.[33]

---

[28] Petition for Limited Waiver of LTD Broadband LLC, AU Docket No. 20-34, WC Docket Nos. 10-90, 19-126 (filed June 7, 2021).

[29] *Rural Digital Opportunity Fund (Auction 904)*, Order, DA 21-1311, AU Docket No. 20-34, WC Docket No. 19-126 (Oct. 20, 2021); *Rural Digital Opportunity Fund (Auction 904)*, Order, DA 21-908, AU Docket No. 20-34, WC Docket No. 19-126 (July 26, 2021).  The Bureau later dismissed LTD's ETC Designation Waiver Request as to South Dakota.  *See Rural Digital Opportunity Fund Bid Defaults Announced*, AU Docket No. 20-34 *et al.*, DA 23-616 (WCB/OEA July 18, 2023).

[30] Petition for Reconsideration of LTD Broadband LLC, AU Docket No. 20-34, WC Docket No. 19-126 (filed Nov. 19, 2021) (requesting reconsideration for the states of Iowa, Nebraska and North Dakota); Petition for Partial Reconsideration of LTD Broadband LLC, AU Docket No. 20-34, WC Docket Nos. 10-90, 19-126 (filed Aug. 21, 2021) (requesting reconsideration for the state of California).

[31] *See* Supplement to Petition for Reconsideration, AU Docket No. 20-34, WC Docket No. 19-126 (filed July 21, 2022) (request to withdraw reconsideration petition for state of Iowa) (*LTD July 2022 Petition for Reconsideration Supplement*); Request for Withdrawal of Petition for Partial Reconsideration, AU Docket No. 20-34, WC Docket Nos. 10-90, 19-126 (filed June 21, 2022) (request to withdraw reconsideration petition for the state of California).

[32] In its last supplement to its petition for reconsideration of the October 2021 ETC deadline waiver denial order for Iowa, Nebraska, and North Dakota, LTD indicated that it was requesting to withdraw its petition with regard to Iowa, but was not seeking to withdraw its petition for Nebraska and North Dakota.  *LTD July 2022 Petition for Reconsideration Supplement* at 2.  LTD stated that if its appeal of the Nebraska Public Service Commission's denial

(continued....)

13.     The Bureau concluded its review of LTD's long-form application in each remaining state in which LTD had placed winning bids to determine whether it met all legal, financial, and technical requirements.  The Bureau determined that LTD was not reasonably capable of complying with the Commission's public interest requirements established for the RDOF program for a number of both financial and technical reasons.  It therefore denied LTD's application and announced LTD in default in all of its remaining winning bids.[34]  The Bureau also dismissed LTD's remaining Petition for Reconsideration regarding its ETC Designation Waiver Requests as to Nebraska and North Dakota.[35]  Having inadvertently failed to dismiss LTD's ETC Designation Waiver Request in South Dakota when it denied LTD's long-form application, the Bureau subsequently dismissed that waiver request in a Public Notice.[36]

14.     LTD now seeks review of the Bureau's decision to deny its Auction 904 application for support.

## III.    DISCUSSION

15.     LTD makes several arguments in support of its Application for Review.  *First*, LTD maintains that denial of its application is fundamentally inconsistent with the Commission's rules governing the RDOF program, in that the Bureau applied an incorrect standard of review, extended the scope of its review beyond the discretion afforded by the Commission's rules, and ignored specific instructions provided by the Commission in the *Auction Procedures PN* with respect to the processing of long-form applications filed by winning bidders.[37]  *Second*, it argues that even if the Commission's rules do permit a review of this scope, it does not establish standards or guidelines to govern such an exercise of discretion, and there is no precedent for denying a complete long-form application or for not relying on provision of a Letter of Credit and bankruptcy opinion letter as all necessary proof of financial capability.[38]  *Third*, LTD argues that the scope of the Staff's action is overbroad in that it denies LTD the opportunity to proceed in any of its winning bid areas.[39]  *Fourth*, LTD argues that the denial of its requests for waiver of the Eligible Telecommunications Carrier ("ETC") designation deadline was disparate treatment when compared to similar waiver requests.[40]  LTD asks that we reverse the Bureau's denial of its application for support in Auction 904 and authorize it to receive support in its remaining winning bids.[41]  We address each argument in turn, and for the reasons explained below, we affirm the Bureau's decision to deny LTD's long-form application.

---

(Continued from previous page) ━━━━━━━━━━━━━━━━━━

of ETC designation was successful, it would seek to supplement its long-form application to include financial and technical information for the designated census blocks in Nebraska. *Id*.  The Commission did not receive a supplement from LTD on this issue.

[33] In addition to its defaults in Kansas and Oklahoma, LTD also defaulted on all of its bids in California and Iowa.

[34] *See 11th RDOF Ready to Authorize/Defaults Public Notice* at 8-11.

[35] *See id.*

[36] *See Rural Digital Opportunity Fund Bid Defaults Announced*, AU Docket No. 20-34 et al., DA 23-616 (WCB/OEA July 18, 2023).

[37] Application for Review at 2.

[38] *Id.*

[39] *Id.* at 2-3.

[40] *Id.* at 3.

[41] *See id*. at 19 (seeking authorization of support in 11 states in which LTD had placed winning bids.  Prior to the Bureau's denial of its application in its remaining winning bid areas, LTD had defaulted on all of its winning bids in Kansas, Oklahoma, California, and Iowa.)

16.    Awarding USF support requires a balancing of potentially competing interests, and that balance is achieved by the Bureau following the specific guidelines the Commission has previously issued.  We are also mindful that our limited USF funding ultimately comes from individual ratepayers, and when evaluating "a proper balancing inquiry," we "must take into account our generally applicable responsibility to be a prudent guardian of the public's resources"[42] by ensuring that USF funding is used efficiently to provide much-needed, reliable service throughout the nation.  After careful review, we find that the Bureau followed Commission guidance as adopted for the RDOF program and correctly concluded that LTD is not reasonably capable of offering the required gigabit-speed, low-latency service throughout the broad areas where it won auction support.

### A.    The Bureau Applied the Correct Standard of Review

17.    LTD first contends that the Bureau applied an incorrect standard of review and exceeded its discretion when denying LTD's application.  Contrary to LTD's arguments, the Commission established procedures for the review of long-form applications in the *Auction 904 Procedures Public Notice.*  Specifically, the Commission delegated authority to the Bureau to determine whether winning auction bidders should be authorized to receive universal service support based on a review of their post-auction long-form applications.  The Bureau's role in reviewing long-form applications is more than a ministerial, box-checking exercise.  Long-form applicants were obligated to file "more extensive information" than was required in their short-form applications in order to "demonstrat[e] to the Commission that they are legally, technically, and financially qualified to receive support."[43]  This process compelled staff to conduct an in-depth review of timely submitted applications both for completeness and compliance with the Commission's rules *and* to determine whether an applicant was financially and technically qualified for support.[44]  If staff decided after reviewing a long-form application that there was insufficient information to make a determination, a long-form applicant was notified that additional information was required.[45]  If a long-form applicant was found ineligible or

---

[42] *High-Cost Universal Service Support Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Order on Remand and Memorandum Opinion and Order, 25 FCC Rcd 4072, 4088, para. 29 (2010).

[43] *Rural Digital Opportunity Fund et al.*, WC Docket No. 19-126 et al., Report and Order, 35 FCC Rcd 686, 717, para. 68 (2020) (*Rural Digital Opportunity Fund Order*); 47 CFR § 54.804(b) (describing the information that must be submitted with a long-form application).

[44] *Id.* at 722, 725 paras. 79, 86 (noting that the long-form application process "will provide an in-depth extensive review of the winning bidders' qualifications" and that long-form applicants "are required to submit extensive information detailing their respective qualifications in their long-form applications, allowing for a further in-depth review of their qualifications prior to authorization of support").  *See also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6112, para. 97 (explaining the Commission's expectation that "the more in-depth long-form application process will further minimize the risk of authorizing an unqualified applicant"); *Rural Digital Opportunity Fund Phase I Auction (Auction 904) Closes; Winning Bidders Announced; FCC Form 683 Due January 29, 2021*, AU Docket No. 20-34 et al., Public Notice, 35 FCC Rcd 13888, 13895, para. 18 (2020) (*Auction 904 Closing Public Notice*) ("Timely submitted applications will be reviewed by Commission staff for completeness and compliance with the Commission's rules and to determine if the long-form applicant has demonstrated that it is technically and financially qualified to fulfill its Rural Digital Opportunity Fund public interest obligations if authorized to receive support.").

[45] *Auction 904 Closing Public Notice*, 35 FCC Rcd at 13895, para. 18 (explaining that the Commission "will notify a long-form applicant if additional information is required").  *See also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6168, para. 303 ("If a long-form applicant submits a technology and system design description that lacks sufficient detail to demonstrate that the long-form applicant has the technical qualifications to meet the relevant Rural Digital Opportunity Fund obligations, the long-form applicant will be asked to provide further details about its proposed network."); 47 CFR § 54.804(b)(viii) (requiring long-form applicants to submit "[s]uch additional information as the Commission may require").

unqualified to receive support, the application would be denied, the applicant would be announced in default, and the winning bids would be subject to forfeiture.[46]

18.    An applicant would be deemed technically and financially qualified for support if the Bureau determined, after evaluating the information submitted with the long-form application, that the "applicant is reasonably capable of meeting its RDOF auction obligations,"[47] with a particular focus on meeting the public interest obligations in the "specific areas" covered by the applicant's winning bids.[48] The Commission defined "reasonably capable" to mean the Commission staff's "reasonable expectation" that the applicant would be able to meet the relevant public interest obligations.[49]  When evaluating an application, "Commission staff will also review the information provided in the short-form and long-form applications to verify that the applicant has the plans and capability to scale the network if necessary."[50] In its review of LTD's long-form application, the Bureau closely followed these announced procedures.

19.    LTD argues that the Bureau applied "objectively the wrong standard of review" by reviewing LTD's long-form application to determine whether it is reasonably capable of meeting its RDOF auction obligations.[51]  This standard of review is wrong, according to LTD, because it stems from language in the *Auction 904 Procedures Public Notice* section addressing the pre-auction short-form application.[52]

20.    In the language cited, the Commission made clear that the review of the long-form application is more intensive than the short-form application review.  Although LTD asserts that no such long-form application review should even exist,[53]  the paragraphs LTD cites *contrast* the more in-depth information and review required at the long-form application stage with the relatively lesser burden of information and review required at the pre-auction short-form application stage.[54]  LTD's argument also ignores the express warning in the *Auction 904 Procedures Public Notice* that a "determination at the

---

[46] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6178, para. 321.  *See also id.* at 6116, para. 108 (noting "an applicant will be deemed in default if at the long-form application stage, Commission staff determines the applicant is not reasonably capable of meeting the public interest obligations associated with its winning bids")*; Rural Digital Opportunity Fund Order*, 35 FCC Rcd at 735, para. 114; *Auction 904 Closing Public Notice*, 35 FCC Rcd at 13895 para. 18 (explaining that "[i]f a long-form applicant ultimately fails to provide all the required information or demonstrate that it is technically and financially qualified, [the Bureau] will release a public notice identifying the applicant and the winning bids that are considered in default").

[47] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6098-99, para. 64.  The Commission defined reasonably capable as referring "to the Commission staff's reasonable expectation that the applicant can meet those obligations."  *Id.*

[48] *Id.  See also id.* at 6124, para. 125 (noting the importance of having "more information about exactly where [an] applicant will win support and how many locations it will serve" in making a determination regarding an applicant's ability to meet the public interest obligations).  A long-form applicant is also required to certify it is "financially and technically qualified to meet the public interest obligations for Rural Digital Opportunity Fund support *in each area for which it seeks support*."  47 CFR § 54.804(b)(2)(ii) (emphasis added).

[49] *Id.* at 6099, para. 64.

[50] *Id*. at 6103, para. 76 (citations omitted).

[51] Application for Review at 7.

[52] See Application for Review at 7; *see also Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6099, paras. 64, 125.

[53] Application for Review at 7.  Indeed, LTD's position cannot be aligned with its certification in its long-form application "that it is aware that if it is not authorized to receive support *based on its application*, the application may be dismissed without further consideration and penalties may apply."  *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6166, para. 296 (emphasis added); 47 CFR § 54.804(b)(6).

[54] *See id*.

short-form stage that an applicant is eligible to bid for a performance tier and latency combination would not preclude a determination at the long-form application stage that an applicant does not meet the technical qualifications for the performance tier and latency combination and thus will not be authorized to receive Rural Digital Opportunity Fund support."[55]

21.     Moreover, in the *Auctions 904 Procedures Public Notice*, the Commission explained that its short-form application review "approach of requiring high-level information that is sufficient for determining eligibility to bid in a state, requiring applicants to make certifications regarding their due diligence and ability to meet the performance requirements, requiring a more thorough long-form application technical showing for the areas where support is won, and imposing a forfeiture for defaults if an applicant is not deemed qualified to be authorized, more appropriately balances the objectives of determining whether an applicant is expected to be reasonably capable of meeting the relevant performance requirements in the areas where it plans to bid with minimizing burdens on applicants and Commission staff."[56]

22.     The long-form application review process, in contrast to the high-level short-form application review process, required a more thorough examination of all relevant material to determine whether LTD could provide the required service in the "specific areas" where it won support.[57]  Put differently, rather than a generalized assessment of whether a short-form applicant could theoretically provide the required service, at some level, in each state where it wished to bid, the long-form application review determined whether the applicant demonstrated through a detailed financial and technical plan that it could provide that service "associated with its winning bids," i.e., in each of the areas where it ultimately won support.[58]

23.     Despite this clearly described and established review process, LTD argues that the Commission considered the review of a long-form applicant's application relative to its winning bids to be "unduly burdensome and potentially irrelevant" and thus the Bureau cannot make a finding that an applicant is not reasonably capable of meeting program requirements.[59]  But LTD makes no argument with respect to the burden placed on it by the long-form review process and only challenges relevance by citing the Commission's broad statement that "conditions on the ground may change," but not by identifying any such conditions in its situation.[60]  While review might be *potentially* irrelevant in some circumstances, LTD's long-form application is not one of them.  We find that the extensive scope of LTD's winning bids—hundreds of thousands of locations in 11 states—when LTD's existing footprint, subscriber base, and experience operating a large network was quite limited—required further inquiry into whether LTD should be authorized for support.  Even though the Commission recognizes that conditions for authorized applicants may change at some point in the future, the Bureau properly considered the areas at issue and used its predictive judgment when assessing the risks of awarding support to LTD.

24.     In sum, LTD makes no compelling argument why we should consider the Commission's clear direction for review of long-form applications to be meaningless.  Because of the more thorough review required by the long-form application review process, the Bureau appropriately assessed LTD's long-form application and gave LTD multiple opportunities to sufficiently address the Bureau's detailed inquiries.  Accordingly, the Bureau's ultimate denial of LTD's long-form application is not inconsistent with the prior approval of LTD's short-form application.  On review, we uphold the Bureau's decision.

---

[55] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6099, para. 64.

[56] *Id*. at 6101, para. 71.

[57] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6099, para. 64.

[58] *Id.* at 6116, para. 108.

[59] Application for Review at 9-10.

[60] Application for Review at 10.

B.      **Review Did Not Lack Standards and Guidelines**

25.      LTD next argues that even if the Commission's rules do permit a review of the scope followed here, it does not establish standards or guidelines to govern such an exercise of discretion, and there is no precedent for denying a complete long-form application or for not relying on provision of a Letter of Credit and bankruptcy opinion letter as all necessary proof of financial capability.[61]  We find that the Bureau's review of LTD's financial qualifications was reasonable, that a merely complete application is not a guarantee of authorization, and that a bank's commitment to issue an LOC and the provision of a bankruptcy opinion letter are necessary but not sufficient steps for successfully completing the financial review process.  Moreover, as explained below, we further agree with the Bureau's determination that LTD's financial submissions do not demonstrate that LTD is reasonably capable of fulfilling the RDOF financial performance obligations.

26.      In its Application for Review, LTD argues that the only proof it was required to provide of its financial ability to build out high-speed service to hundreds of thousands of locations across the eleven states in which it did not previously default was the required application certifications and the Letter of Credit and bankruptcy opinion letter required after an applicant is announced as ready to authorize.[62]  LTD incorrectly conflates the certifications required as part of the long-form application with the review delegated to the Bureau to determine if the financial plans submitted fulfill the obligations of the RDOF program.  At no point in the extensive explanations of the post-auction application process provided in the RDOF *Report and Order* and the *Auction 904 Procedures Public Notice* did the Commission indicate that long-form applications are self-authenticating through certifications, or that certifications somehow render the rest of the application—which includes audited financial statements (if they were not submitted at the short-form stage) and a detailed project funding description—unnecessary. In light of the long-form application's other evidentiary requirements with respect to financial qualifications, LTD's argument that the required application certifications are dispositive because they ensure that what the applicant certifies to is accurate, complete, and sufficient must fail.[63]  Otherwise, we would be left with the incongruous result that the Bureau could only consider whether a document submitted with the long-form application had the title of a project funding description, but could not analyze its contents.  That cannot be—and is not—what the Commission intended.

27.      Likewise, we cannot ignore these requirements and look solely at an eligible bank's willingness to issue a letter of credit as sufficient evidence of an applicant's financial qualifications. Quoting paragraph 64 of the *Auction 904 Procedures Public Notice*, LTD states that "Commission staff will evaluate the information submitted in the long-form application and will rely on an eligible bank's willingness to issue the applicant a letter of credit to determine whether an applicant is reasonably capable of meeting its [RDOF] auction obligations in the specific areas where it has winning bids."[64]  Ignoring the first clause of that passage, LTD asserts that staff should rely on an eligible bank's willingness to issue an LOC to determine whether an applicant is reasonably capable of meeting its auction obligations *without* "Commission staff … evaluat[ing] the information submitted in the long-form application."[65]  The plain language of the passage LTD cited makes clear that LTD's interpretation cannot be correct. Evaluating the submitted financial information regarding the applicant's financial health and sustainability and the reasonableness and thoroughness of its financial planning and projections made in preparing to build out the required service in the required time period is an essential part of determining whether or not to authorize an applicant to receive USF support.

---

[61] *Id.*

[62] Application for Review at 8-10.

[63] Id.

[64] *Auction 904 Procedures Public Notice,* 35 FCC Rcd at 6099, para. 64.

[65] *Id.*

28.     LTD further incorrectly asserts that the post-review provision of a Letter of Credit (LOC) and a bankruptcy opinion letter, requirements for authorization that are only necessary after the Bureau's review and publication of the Ready-to-Authorize Public Notice,[66] negate the requirement that the Bureau first reach a determination that an applicant is reasonably capable of fulfilling the terms of the program and is financially qualified to receive support prior to authorization.[67] If the Commission intended an LOC and a bankruptcy opinion letter to substitute for review of an applicant's financial qualifications, the financial review portion of application processing would merely consist of checking certifications and confirming the accurate provision of an LOC and bankruptcy opinion letter. While long-form applicants were required to submit an LOC commitment letter (a letter from an eligible bank indicating that it was willing to provide the applicant with an LOC), the very provision of a letter indicating willingness to provide an LOC at a later date after staff review and announcement as ready to authorize in a public notice also confirms that review and approval of the application by staff must occur before an LOC is issued, not that a bank's expressed willingness to issue an LOC negates the need for staff to review an applicant's financial qualifications.

29.     LTD additionally asserts that the authority delegated to the Bureau extends only as far as the ability to deny an incomplete application or an application lacking an LOC because the Commission failed to define what "ineligible" or "unqualified" meant in this context.[68] We disagree. The Commission has explicitly stated what information is required to be submitted by long-form applicants and how it will rely on the Bureau to determine whether an applicant is reasonably capable of meeting program requirements. While the Commission defined "reasonably capable," it was under no obligation to enumerate specific financial parameters for that determination as LTD appears to suggest. As with the review of short-form applications, for which it was appropriate "to tailor the review to each applicant's circumstances and . . . determine [qualifications] based on the totality of information,"[69] it is also appropriate to tailor review to the circumstances at the long-form stage.

30.     In any event, we agree with the Bureau's determination that the financial information LTD submitted does not support a finding that LTD is financially qualified. Notably, LTD's arguments in its Application for Review are procedural, and LTD does not challenge any of these specific findings and thus waives all arguments pertaining to them.

31.     *Financial Qualifications*. A long-form applicant must both demonstrate and certify that it will have available funds for all project costs that exceed the amount of support to be received for the first two years of its support term.[70] Likewise, it must certify that it will comply with all program requirements, including service milestones, and demonstrate that it is reasonably capable of doing so.[71] As detailed in our May 26, 2022, letter, the Bureau identified significant concerns with LTD's financial ability to complete a project of this size in the time required, even as reduced by the removal from consideration of the states in which LTD had failed to obtain ETC designation. {[████████

---

[66] *See* 47 CFR § 54.804(b)(6)(v); *Auction 904 Procedures Public Notice,* 35 FCC Rcd at 6177, para. 319-20 (2020) (*Auction 904 Procedures Public Notice*) ("No later than 10 business days after the release of the public notice, a long-form applicant must obtain one irrevocable standby letter of credit at the value specified in section 54.804(c)(1) from a bank acceptable to the Commission as set forth in section 54.804(c)(2) for each state where the long-form applicant is seeking to be authorized") and explaining the bankruptcy opinion letter requirement").

[67] Application for Review at 8-10.

[68] Application for Review at 13.

[69] *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6096, para. 60; see also *id*. at para. 61, noting further review required at the long-form application stage.

[70] 47 CFR § 54.804(b)(2)(v); *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6098-99, 6174-75, paras. 64, 312.

[71] *Id*.

████████████████████████████████████████████████████████████████████ }To complete the RDOF program requirements, LTD asserted that it would scale up its operation dramatically, with a projected asset growth of {[██████]} [73] and would somehow spend {[████████]} on Cap-Ex in program Year Two alone. To achieve this pace of growth, LTD would need capital far in excess of its current assets.

32.    In its first financial proposal, LTD projected that it could complete the project without financing. To address staff's concern that LTD did not have access to sufficient capital to deploy the extensive network required for its winning bid areas in the time required by the RDOF program, LTD substantially changed its financial proposal between LTD's initial long-form application submission and its response to the final demand letter. LTD's final financial plan included a new term sheet that purported to show that it could draw upon a {[████████████████████████████████ ████████]} This term sheet thus tacitly admits that LTD's 2021 projections were unrealistic and that LTD would require an enormous infusion of capital to deploy as required. Indeed, in its last revised submissions, LTD estimated that it would need{[████████]} for the first two years of the RDOF program, while RDOF support would only provide $198,534,000 during the same period. Because the most recent projections left a gap of {[████████,]} LTD stated that it planned to draw upon the loan {[████████████]} to provide LTD with working capital to overcome this shortfall.

33.    Staff's analysis of LTD's submitted information revealed that it appeared that LTD would be unable to meet the loan's initial prerequisites specified in the term sheet it submitted, though the term sheet was dated the same day it was submitted. {[████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████]} And LTD did not submit a revised or corrected term sheet—as required by section 1.65

---

[72] {[████████████████████████████████████████████████████████████ ████████████████]}

[73] {[████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████]}

[74] {[████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████]}

[75] {[████████████████████████████████████████████████████████████ ████████████████████████]}

of the Commission's rules[76]—or offer any explanation to suggest that this default term was no longer applicable. {[ ████████████████████████████████████████████████████

████████████ ]} It was unclear and appeared doubtful to staff whether LTD would be able to leverage itself to this degree in such a short period, and importantly LTD offered no explanation of how it would accomplish this presumably substantial raising of funds. Nor did LTD clarify what an "acceptable" capital raise would be {[ ██████ ]} These conditions involved significant risks that LTD would not be able to execute the loan {[ ██████████ ]} as described, and/or would default on the loan within the first year, upending LTD's financial plan. Accordingly, the Bureau correctly determined that it could not rely upon this new term sheet to demonstrate that LTD would be able to have the funds to cover the first two years of support, as required.

    34.    A long-form applicant must describe how the required construction will be funded in each state. The description should include the estimated project costs for all facilities that are required to complete the project, including the costs of upgrading, replacing, or otherwise modifying existing facilities to expand coverage or meet the performance requirements.[77] The estimated costs must be broken down to indicate the costs associated with each proposed service area at the state level.[78] We agree with the Bureau that LTD has not met these requirements, as its project funding description does not provide differentiated anticipated costs and related funding for each of the areas for which LTD is seeking support. We can only infer from the numbers provided that LTD is presuming that deployment costs are equal across all states and rural regions within each state, but that presumption seems unreasonable in light of the many different environments in different states in which LTD had winning bids. If there were a reason why that presumption was accurate, LTD should have, but did not, include that information in its final application filings.

    35.    We further observe that LTD attempted to demonstrate its financial qualifications based upon numerous assumptions that belie both the Bureau's experience evaluating other applications and common sense. For example, LTD relied upon unrealistic assumptions in its last submission that are too low compared to industry averages for cost-per-mile for fiber deployment but too high for average revenue per user (ARPU).[79] In its submissions, LTD further assumed no CapEx allocation after the sixth year of RDOF funding, even though LTD's projections included further growth of locations and connections that would necessarily require CapEx, and LTD projected that its operating expenditures (OpEx) would decline as a percentage of revenue from its legacy network in the first year of its RDOF financial projection, though typically OpEx would increase as a percentage of revenue in the first program year because rapid new network deployment would require significantly higher operating expenses. To be clear, an applicant could project financial assumptions different from industry norms and give sufficient explanation of its assumptions to establish that they were reasonable under its specific circumstances. However, LTD gave no explanation as to why its unusual assumptions were reasonable.

    36.    Also, a long-form applicant must also include financial projections that demonstrate that it can cover the necessary debt service payments over the life of its loans. Although, as noted previously, the Bureau determined that it could not confidently rely on LTD's term sheet {[ ██████████ ]} as a source of funds, the term sheet did provide insight into LTD's plans. It appeared that LTD planned to

---

[76] 47 CFR § 1.65. Each auction applicant has a continuing obligation to maintain the accuracy and completeness of information furnished in a pending application.

[77] 47 CFR § 54.804(b)(2)(vi), *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6174-75, para. 312.

[78] *Id.*

[79] {[ ██████████████████████████ . ]} We requested that LTD provide its ARPU for the past five years to validate this assumption, but LTD did not provide the requested information.

rely upon high interest debt financing and an additional undefined "acceptable public or private equity raise" to be completed within a year. These plans created significant additional leverage for a company already proposing to rapidly expand its business and entailed a high risk that LTD would not be able to cover all necessary debt payments over the life of any loans, thus jeopardizing its ability to fulfill the RDOF performance requirements.[80]

37.     Taken together, the Bureau's review of LTD's financial submissions indicated that it was not reasonably capable of meeting the relevant public interest obligations for the RDOF program. We affirm that decision and deny the Application for Review as to the financial qualifications.

38.     *Technical qualifications.* As it does with its financial qualifications, LTD conflates the required certifications with the Bureau's review of the submitted application regarding technical qualifications. LTD argues that the Commission's rules require only "certification" and "description," asserting that beyond requiring a professional engineer to certify that the network proposed by the application is capable of delivering the required service to the required locations, the Bureau may make no further investigation of the applicant's technical ability to fulfill the program requirements.[81] Further, LTD claims that because the Commission provided no criteria for the review of long-form applications, the Bureau could not deny the application for substantive technical reasons. For the same reasons as set forth above, these procedural arguments fail. And as noted above, LTD does not challenge any of the Bureau's specific technical findings and has thus waived its arguments in that regard.

39.     In particular, the Commission required that as part of a long-form application, an applicant for RDOF support provide a detailed technology and system design description that demonstrates that the applicant is reasonably capable of meeting program requirements.[82] During 2021 and 2022, staff communicated to LTD deficiencies in its technical submissions and asked LTD for more specificity on how it would engineer, deploy, and operate its proposed network, observing that the system design and plans submitted appeared too generalized, cursory, and simplistic to address the vast array of differing conditions to be met throughout a multi-state winning bid area. The Bureau's May 26, 2022, letter detailed numerous outstanding questions regarding LTD's deployment and operations plans. To address these concerns, LTD relied upon a third-party consultant to assist with its final response.[83] However, although that filing did provide a somewhat more detailed technical response, staff found that LTD still failed to demonstrate that it was reasonably capable of meeting program requirements and we affirm that finding.

---

[80] We further note that in its financial projections, LTD had not accounted for potential default payments to the Commission for bids defaulted prior to the submission of its final financial projections: $2,304,000 apparent liability that LTD faces for defaulting on all its bids in Kansas and Oklahoma and the potential additional penalty for defaulting on all bids in California and Iowa. While not yet finalized, these apparent liabilities were known to LTD, were straightforwardly calculable, and were significant for a company the size of LTD, thus further increasing the financial risks involved with this application.

[81] Application for Review at 11-12.

[82] 47 CFR § 54.804(b)(2)(iv) (requiring submission of "A description of the technology and system design the applicant intends to use to deliver voice and broadband service, including a network diagram which must be certified by a professional engineer. The professional engineer must certify that the network is capable of delivering, to at least 95 percent of the required number of locations in each relevant state, voice and broadband service that meets the requisite performance requirements for Rural Digital Opportunity Fund support."); *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6098-99, 6167-74, paras. 64, 301-11.

[83] To be clear, by noting this, we are not criticizing LTD for hiring a third-party consultant as LTD infers. Application for Review at 12. But the engagement of a consultant so late in the long-form application process may suggest a last-ditch effort to obtain necessary technical expertise for the sole purpose of the Bureau's authorization of support despite the absence of such expertise in-house at LTD. There is no guarantee that the consultant would be retained throughout the deployment when LTD would be required to provide service across the vast area of its winning bids.

40.     For example, LTD failed to provide required specific and localized project designs; instead, LTD applied an unrealistic one-size-fits-all approach for the vast areas where it would be required to deploy last-mile fiber to every serviceable location and the supporting middle-mile and core infrastructures, such as providing a brief template labeled for one state that presumably was intended to outline last mile connectivity for all of its winning bid areas, and failing after specific inquiry to detail a comprehensive network operations and customer support infrastructure.  Issues such as these in LTD's submissions indicate that LTD is not reasonably capable of supporting a network of considerable size and complexity that meets the RDOF performance requirements.

41.     The fact that the *Auction 904 Procedures Public Notice* does not specify each technical criterion does not somehow foreclose staff's consideration of all relevant information when determining whether an applicant is technically qualified to receive support.  The Commission established an iterative process for application review precisely so that lacking information could be discussed and resubmitted, and numerous applicants in this and previous USF support auctions took advantage of the opportunity to resubmit information as requested by the reviewers to successfully complete their applications for support.  LTD's resubmitted technical filings reasonably caused the Bureau to be concerned that LTD had not adequately taken account of how significantly LTD's business needs to scale up to achieve equipment purchases, hiring, construction, deployment, maintenance, operations, and customer service for the sizeable network of LTD's remaining winning bids.  Despite repeated requests from staff over a year and a half, LTD did not provide specific and detailed operational infrastructure information that sufficiently mitigates or otherwise addresses the technical and engineering risks involved in a rapid expansion in the scope of LTD's operations into multiple states.  As such, the Bureau could not conclude that LTD was reasonably capable of meeting the technical requirements to deploy and operate gigabit service to all the proposed locations in the time required and within the RDOF performance standards.  We uphold that determination and deny the Application for Review as to LTD's technical filings as well.

C.     **The Bureau Had No Obligation to Tailor LTD's Winning Bids to an Area That LTD Could Potentially Serve**

42.     LTD's argument that the decision to deny its application in all remaining areas was overbroad must also fail.[84]  Nowhere in the *Auction 904 Procedures Public Notice* does the Commission state—or even imply—that the Bureau's eligibility determinations were to be made on a census block group (CBG) by-CBG basis.  Even though well apprised of staff's substantial concerns with its long-form application, LTD did not submit any proposal to the Bureau to narrow the scope of its winning bids by selectively defaulting on certain CBGs.  Nonetheless, LTD suggests—for the first time in its Application for Review—that it would accept a partial authorization and asserts that the Bureau erred because it did not pick and choose those CBGs where LTD might actually be able to meet the RDOF requirements to authorize.  In any event, the Bureau had no basis to do so from LTD's submissions.  Specifically, LTD did not differentiate between areas in its application filings regarding financial preparedness to complete the program requirements, nor did it differentiate between the technical requirements necessary to serve the disparate areas in its winning bid areas.  The Bureau's decision, therefore, that LTD's application must fail in all remaining, un-defaulted areas was the only logical conclusion when faced with the numerous unexplained or problematic aspects of its application.  Reducing the size of LTD's overall project by denying its application in certain states while allowing it to continue working to improve its application in the remaining states was also not required under the RDOF program rules, and LTD's application gave the Bureau no way to differentiate in which states LTD could potentially offer a better application than it had succeeded in doing after an extensive iterative process of revision.  While certain other winning bidders in Auction 904 were announced as ready-to-authorize in some states but not in others (or in certain states before others), those partial authorizations were dependent on the timing of obtaining ETC designations, rather than on the assessed quality of the application.

---

[84] Application for Review at 17-19.

### D.    The Bureau Appropriately Denied LTD's Waiver Requests

43.    LTD argues that the denial of its requests for waiver of the Eligible Telecommunications Carrier (ETC) designation deadline constituted disparate treatment when compared to the treatment of similar waiver requests.[85]  While LTD notes certain similarities between its circumstances and those of another applicant whose ETC designation waiver requests were granted, it fails to recognize a key difference.  That is, the other entity's waiver request was granted after a finding that it served the public interest because its application had been otherwise reviewed and approved and was thus ready to be authorized, unlike LTD's circumstances.[86]  LTD also fails to acknowledge that, in its initial ETC Designation Waiver Request, it admitted that it delayed filing for certain ETC designations for strategic business reasons.[87]  This admission clearly distinguishes LTD's circumstances, as addressed in the initial Order denying the first three LTD ETC Designation Waiver Requests.[88]  Moreover, this decision to delay seeking designations for strategic reasons has consequences and places LTD's conduct outside the realm of good faith reliance on outside counsel, even if we were to agree that this rationale would be sufficient grounds to grant a waiver.  As noted in the Denial Order, "[w]e do not consider an entity's specific corporate strategy or business considerations for delaying the satisfaction of a Commission requirement to constitute special circumstances that would justify a waiver," and the Bureau also determined that LTD did not support its argument that its "strategic reasons" were good cause for its failure to pursue obtaining its ETC designations in the relevant states, and noted that it did not appear in the public interest to grant the waiver as it would be inconsistent with the goal of expeditiously providing service to rural communities.[89]

44.    LTD further asserts that the Bureau's denial of its waiver requests, and/or dismissing as moot its Petition for Reconsideration of the denial of its ETC designation waiver requests, was a circular rationale for denying its application in certain states.[90]  Regardless of whether certain states took into

---

[85] Application for Review at 3, 17-19.

[86] See *11th RDOF Ready to Authorize/Defaults Public Notice* at 3-6.

[87] LTD ETC Designation Waiver Request at 8, (filed June 7, 2021).

[88] See *Rural Digital Opportunity Fund*, AU Docket No. 20-34, WC Docket No. 19-126, Order, DA 21-908 (July 26, 2021).

[89] See *Rural Digital Opportunity Fund*, AU Docket No. 20-34, WC Docket No. 19-126, Order, DA 21-908 at 4-5 (July 26, 2021).

[90] Application for Review at 19-20.  See also Petition for Reconsideration of LTD Broadband LLC, AU Docket No. 20-34, WC Docket No. 19-126 (filed Nov. 19, 2021) (LTD Nov. Petition) (requesting reconsideration for the states of Iowa, Nebraska and North Dakota).  On June 7, 2021, LTD submitted requests for waiver of the ETC requirement to submit, within 180 days of being announced as a winning bidder, appropriate documentation of ETC designation in multiple states, which the Bureau eventually denied in six states (California, Kansas, Oklahoma, Iowa, Nebraska, and North Dakota).  On July 26, 2021, the Bureau addressed a portion of LTD's requests, denying its requests in three of those states: California, Kansas, and Oklahoma.  *Rural Digital Opportunity Fund*, AU Docket No. 20-34, WC Docket No. 19-126, Order, DA 21-908 (July 26, 2021).  LTD subsequently defaulted on all bids in Kansas and Oklahoma and filed a Petition for Partial Reconsideration of the ETC waiver denial order for California, but then later withdrew that request.  *See* Request for Withdrawal of Petition for Partial Reconsideration, AU Docket No. 20-34, WC Docket Nos. 10-90, 19-126 (filed June 21, 2022) (request to withdraw reconsideration petition for the state of California); Petition for Partial Reconsideration of LTD Broadband LLC, AU Docket No. 20-34, WC Docket Nos. 10-90, 19-126 (filed Aug. 21, 2021) (requesting reconsideration for the state of California).  On October 20, 2021, the Bureau denied LTD's request for waiver of the ETC documentation deadline regarding Iowa, Nebraska, and North Dakota.  *Rural Digital Opportunity Fund*, AU Docket No. 20-34, WC Docket No. 19-126, Order, DA 21-1311 (Oct. 20, 2021).  Similarly, LTD filed a Petition for Reconsideration of the ETC waiver denial order for Iowa, Nebraska, and North Dakota, and then withdrew that request for Iowa.  *See* Supplement to Petition for Reconsideration, AU Docket No. 20-34, WC Docket No. 19-126 (filed July 21, 2022) (request to withdraw reconsideration petition for the state of Iowa); LTD Nov. Petition.  Thus, the Commission's announcement of LTD's ETC requirement waiver denials in California and Iowa remains in place.

account the denial of LTD's waiver requests pertaining to other states—a decision that we find to be proper—support cannot be authorized in areas for which an applicant has not obtained an ETC designation.[91]  But in LTD's case, any adverse decisions on ETC designations are immaterial: they did not preclude LTD from receiving support.  Rather, the deficiencies in LTD's application required denial of authorization in all states in which LTD had not already defaulted, even those states in which it had obtained an ETC designation.  While the failure to obtain ETC status in certain states would have prevented authorization in those states, it was ultimately the failure of LTD to demonstrate in its long-form application that it was reasonably likely to meet program requirements that prevented LTD's authorization in any state.[92]

## IV.    ORDERING CLAUSES

45.        Accordingly, **IT IS HEREBY ORDERED**, pursuant to sections 4(i), 4(j), 5(c), and 254(h) of the Communications Act, 47 U.S.C. §§ 154(i), 154(j), 155(c), and 254(h), and sections 1.3, 1.115, and 54.722 of the Commission's rules, 47 CFR §§ 1.3, 1.115, and 54.722, and the rules set forth in the *Auction 904 Procedures Public Notice*, that the Application for Review filed by LTD Broadband, LLC on September 8, 2022 is  **DENIED**.

46.        **IT IS FURTHER ORDERED**, that the Opposition and Motion to Hold Proceedings in Abeyance filed by Ensuring RDOF Integrity Coalition on September 26, 2022 is **DISMISSED AS MOOT**.

47.        **IT IS FURTHER ORDERED** that this Order on Review **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[91] 47 CFR § 54.804(b)(5) (requiring winning bidders to submit within 180 days of the announcement of winning bids, a certification of ETC designation in all relevant areas and supporting documentation for that certification); *Auction 904 Procedures Public Notice*, 35 FCC Rcd at 6176, para. 316; *see also Rural Digital Opportunity Fund et al.*, WC Docket No. 19-126 et al., Report and Order, 35 FCC Rcd 686, 727-28, para. 92 (2020) (*Rural Digital Opportunity Fund Order*).

[92] LTD's remaining Petition for Reconsideration is hereby dismissed as moot. Furthermore, the Motion to Hold Proceedings in Abeyance filed by Ensuring RDOF Integrity Coalition in the Auction 904 Docket on September 26, 2022 is also dismissed as moot in that the proceedings to which that Motion pertained are resolved in this document.