IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

No. 24-1017

———————

LTD BROADBAND, LLC

PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

JONATHAN S. KANTER
ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
STEVEN J. MINTZ
ATTORNEYS

UNITED STATES
    DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**1. Parties.**

The petitioner is LTD Broadband, LLC. The respondents are the Federal Communications Commission and the United States of America. All parties that appeared before the agency are listed in the brief of petitioner.

**2. Rulings under review.**

*Application for Review of LTD Broadband, LLC; Denial of Application for Rural Digital Opportunity Fund/Auction 904*, 2023 WL 8643568 (rel. Dec. 4, 2023).

**3. Related cases.**

This case has not previously been before this Court or any other court. We are aware of no pending cases related to this one.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY ............................................................................................. vi

INTRODUCTION ......................................................................................1

JURISDICTION ........................................................................................4

QUESTIONS PRESENTED .......................................................................4

STATUTES AND REGULATIONS ...........................................................5

COUNTERSTATEMENT .........................................................................5

I.   The Rural Digital Opportunity Fund Auction .........................................6

II.   The *Order* On Review ........................................................................17

SUMMARY OF ARGUMENT .................................................................20

STANDARD OF REVIEW ......................................................................23

ARGUMENT ...........................................................................................24

I.   LTD's Long-Form Application Was Properly Reviewed In
Accordance With The Commission's Auction Rules And
Procedures. ....................................................................................24

   A.   The Bureau Properly Performed An In-Depth Review Of
LTD's Long-Form Application. ...........................................24

   B.   The Bureau Reviewed LTD's Long-Form Application
Under The Correct Standard. ..............................................42

II.   LTD Had Fair Notice Of The Standard That The
Commission Would Employ In Reviewing Its Long-Form
Application. ....................................................................................50

III.   The Commission's Treatment Of LTD Is Consistent With
That Of Other Applicants. ..............................................................54

IV.  The Commission Reasonably Denied LTD's Long-Form Application In Full. ...................................................................57

CONCLUSION ..............................................................................58

# TABLE OF AUTHORITIES

**CASES**

*Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1 (D.C. Cir. 2009)............................................................. 8, 26

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ......................................5

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004)....................................24

*Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008)............................................................55

*Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 296 F.3d 1120 (D.C. Cir. 2002)............................................................54

*FCC v. WNCN Listener's Guild*, 450 U.S. 582 (1981) ............................................................34

*General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995)............................................................. 50, 53

*Global Crossing Telecomms. Inc. v. FCC*, 259 F.3d 740 (D.C. Cir. 2001)............................................36

*In re Core Commc'ns, Inc.*, 455 F.3d 267 (D.C. Cir. 2006)............................................................43

*Lakeshore Broad., Inc. v. FCC*, 199 F.3d 468 (D.C. Cir. 1999)............................................................55

*Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551 (D.C. Cir. 1987)............................................................54

*Melcher v. FCC*, 134 F.3d 1143 (D.C. Cir. 1998) ........................................34

\* *Northstar Wireless, LLC v. FCC*, 38 F.4th 190 (D.C. Cir. 2022)............................................. 26, 48, 53

*NTCH, Inc. v. FCC*, 841 F.3d 497 (D.C. Cir. 2016) ............................... 24, 48

\* *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)............................................. 34, 41, 42

\* *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017)............................................. 48, 55

*United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998)............................................................51

*Vernal Enters., Inc. v. FCC*, 355 F.3d 650 (D.C. Cir. 2004) ............................................................................ 55, 56

**STATUTES**

5 U.S.C. § 706(2)(A) ...........................................................23

28 U.S.C. § 2342(1) ..............................................................4

47 U.S.C. § 151 ....................................................................5

47 U.S.C. § 155(c) ................................................................8

47 U.S.C. § 214(e) ..............................................................14

47 U.S.C. § 254 ............................................................. 5, 14

47 U.S.C. § 402(a) ................................................................4

\* 47 U.S.C. § 405(a) ...................................................... 43, 48

47 U.S.C. § 503 ..................................................................10

**REGULATIONS**

47 C.F.R. § 54.804(a) .........................................................52

\* 47 C.F.R. § 54.804(b) .......................................... 9, 28, 30, 51

**ADMINISTRATIVE MATERIALS**

*Connect America Fund*, 31 FCC Rcd 5949 (2016) .........................................38

Federal Communications Commission, Letters to Long-Form Applicants about Identified Census Blocks ................................................................................56

*In re Application for Review of Starlink Services, LLC*, 2023 WL 8696905 (rel. Dec. 12, 2023) ..............................55

*Rural Digital Opportunity Fund Support Authorized for 2,008 Winning Bids*, 36 FCC Rcd 17198 (WCB/OEA 2021) ............................................................56

*Two Applicants for Rural Digital Opportunity Fund in Default*, 2023 WL 8643472 (rel. Dec. 5, 2023) ....................56

**OTHER MATERIALS**

Black's Law Dictionary (11th ed. 2019) .......................................32

Dep't of Agric., Rural Utils. Serv., Corrected
    Notice of Funding Opportunity for the Cmty.
    Connect Grant Program for Fiscal Year 2023, 88
    Fed. Reg. 87750 (Dec. 19, 2023) ...............................................................41

Dep't of Commerce, Nat'l Telecomms. and Info.
    Admin., Broadband Equity, Access, and
    Deployment (BEAD) Program Notice of Funding
    Opportunity (May 13, 2022) ........................................................41

Merriam Webster Dictionary ................................................................. 26, 32

*\* Cases and other authorities principally relied upon are marked with asterisks.*

## GLOSSARY

| | |
|---|---|
| Bureau | The Federal Communications Commission's Wireline Competition Bureau |
| FCC | Federal Communications Commission |

———————

No. 24-1017

———————

LTD BROADBAND, LLC

PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

BRIEF FOR RESPONDENTS

———————

## INTRODUCTION

In the Rural Digital Opportunity Fund auction, the Federal
Communications Commission (FCC) allocated up to $16 billion to support
the deployment of voice and broadband service in unserved and underserved
rural areas. In doing so, the Commission employed the same two-step
application process that it had used in earlier auctions. Pre-auction, potential
bidders filed high-level information in "short-form" applications to establish
their eligibility to participate in the auction. Post-auction, winning bidders
filed extensive information in "long-form" applications to establish their

qualifications for Rural Digital Opportunity Fund support. The Commission delegated authority to its staff in its Wireline Competition Bureau (Bureau) to conduct an in-depth review of long-form applications to determine whether the applicant should be authorized to receive support.

Petitioner LTD Broadband was one of 386 bidders deemed qualified to participate in the auction. At the time of the auction, LTD had 15,000 customers in five states. When the auction closed, LTD had placed winning bids to deploy broadband service to 528,088 residences and small businesses in 15 states, amounting to $1,320,920,719 of Rural Digital Opportunity Fund support.

After reviewing LTD's long-form application and accompanying documents, the Bureau determined that LTD was neither technically nor financially qualified for support. LTD does not contend that the Bureau's findings underlying those conclusions were incorrect; instead, it primarily asserts that the Bureau was not permitted to review its long-form application for anything beyond completeness.

In the rules for the auction, however, the Commission repeatedly stated that the Bureau would perform an in-depth review of long-form applications, and it specified the extensive technical and financial information that winning bidders would have to file with those applications. There would have been no

reason to have required the submission of that information if the Bureau was not permitted to review it. And it makes little sense, and would hardly comport with the Commission's responsibilities, for the agency to have given more than $1 billion in federal subsidies to a small company with no track record of operating a large voice and broadband network without checking whether the company had the technical and financial wherewithal to do what it said it could do.

Nor was LTD's long-form application subject to a "more exacting review" than provided for in the auction rules and procedures. Even with extensive, personalized guidance from the Bureau, LTD never provided the information specified by the agency, and the information that LTD did provide failed to establish that it was technically and financially qualified for support. LTD has never disputed the Bureau's findings about its lack of qualifications.

LTD also had ample notice of the procedures that the Bureau would use and the standard that the Bureau would apply in reviewing LTD's long-form application. And any confusion LTD may have had about long-form application filing requirements should have been resolved through its communications with the Bureau over the course of a year and a half.

Numerous other winning bidders used the same iterative review process to successfully complete their long-form applications.

Finally, LTD never raised the possibility of granting its long-form application in some but not all service areas, and the technical and financial information that LTD submitted did not sufficiently differentiate between geographic locations. The Bureau thus had no basis on which to determine whether LTD could have provided service in less than all of the areas for which it had sought support.

## JURISDICTION

The *Order* on review was released on December 4, 2023. *Application for Review of LTD Broadband, LLC; Denial of Application for Rural Digital Opportunity Fund/Auction 904*, 2023 WL 8643568 (*Order*). LTD timely filed a petition for judicial review on February 2, 2024. This Court's jurisdiction rests on 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

## QUESTIONS PRESENTED

1. Whether the Commission reasonably determined that the Bureau followed the procedures laid out for the Rural Digital Opportunity Fund auction, which required an "in-depth review" of a winning bidder's long-form application, and whether the Bureau applied the correct standard in reviewing the application.

2. Whether the Commission provided LTD fair notice of the procedures that the Bureau would use and the standard that the Bureau would apply in reviewing LTD's long-form application.

3. Whether the Commission reasonably determined that the Bureau reviewed LTD's long-form application using the procedures and standard that the Bureau applied when it reviewed other Rural Digital Opportunity Fund long-form applications.

4. Whether the Commission reasonably affirmed the Bureau's denial of LTD's long-form application in total rather than in specific geographic areas.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are attached in an addendum to this brief.

## COUNTERSTATEMENT

Congress created the FCC to "make available, so far as possible, to all the people of the United States...a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. "The FCC aims to achieve 'universal service' by ensuring that critical communications technologies are made available throughout the United States." *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1241 (D.C. Cir. 2018) (citing 47 U.S.C. § 254).

## I.    THE RURAL DIGITAL OPPORTUNITY FUND AUCTION

"Bringing digital opportunity to Americans living on the wrong side of the digital divide continues to be the Federal Communication Commission's top priority." *Rural Digital Opportunity Fund; Connect America Fund*, 35 FCC Rcd 686, 687 ¶ 1 (2020) (*Auction Order*) (JA ___). The Commission has determined that "[w]ithout access to broadband, rural communities cannot connect to the digital economy and the opportunities for better education, employment, healthcare, and civic and social engagement it provides." *Id*.

Though the Commission "[i]n recent years…has made tremendous strides toward its goal of making broadband available to all Americans," it recognized that "more work remains to be done." *Id*. ¶ 2 (JA ___). Thus, in January 2020, the Commission established the Rural Digital Opportunity Fund, which dedicated $20.4 billion over 10 years to "support up to gigabit speed broadband networks in rural America." *Id*. ¶ 5 (JA ___). The Commission opted to allocate that support "through a multi-round, reverse, descending clock auction[1] that favors faster services with lower latency." *Id*.

_____

[1] A reverse auction format selects winners based on the lowest bids. In a descending clock auction, the price or support amount starts high, and descends in a series of bidding rounds. In general, in each round of the Rural Digital Opportunity Fund auction, bidders indicate if they are willing to provide service in specified areas at the current support level. Public Notice, *Notice and Filing Requirements and Other Procedures for Auction 904*, 35 FCC Rcd 6077, 6147 ¶ 215 (2020) (*Auction Procedures Public Notice*)

(Latency is a measure of the time it takes for a packet of data to travel from one point to another in a network.) The first phase of the auction would award up to $16 billion to fund broadband service in areas where no service provider was offering or had committed to offer broadband service of at least 25 megabits per second for downloads and 3 megabits per second for uploads (25/3 Mbps). *Id*. ¶¶ 8-9 (JA ___).

   *Program Requirements*. As part of their "public interest obligations," Rural Digital Opportunity Fund support recipients were required to offer both voice service and broadband service. Bids would be accepted for four broadband performance tiers, each with varying speed and usage allowances, and either high or low latency. *Id.* ¶¶ 31-44 (JA ___). In return for support, funding recipients were required to offer voice service and broadband service that met the performance and latency requirements applicable to their winning bids. *Id*. Support recipients were also required to offer those services to a specified number of locations by certain deadlines, *id.* ¶¶ 45-55 (JA ___), and at rates that are reasonably comparable to rates offered in urban areas, *id.* ¶ 42 (JA __).

_____

(JA ___). When the prices decline to the point that the Rural Digital Opportunity Fund budget can pay the current bids, the auction assigns support to the winning bidders in exchange for providing broadband service to the areas covered by their bids. *Id.* ¶¶ 217-218 (JA ___).

*Application Procedures.* On June 11, 2020, the Commission issued a Public Notice setting forth the filing requirements and other procedures for the auction. The Commission announced that it would utilize a two-stage application process. Pre-auction, potential bidders were required to file "short-form" applications to establish their eligibility to participate in the auction. *Auction Procedures Public Notice* ¶ 27 (JA ___). The short-form application requested "high-level" information. *Id*. ¶ 71 (JA ___); *see id*. ¶ 66 (JA ___). The Commission delegated authority to the Bureau to review short-form applications to determine whether "the applicant has the legal, technical, and financial qualifications to participate in" the auction. *Id.* ¶ 27 (JA ___).[2] Post-auction, winning bidders were required to file "long-form" applications to establish their eligibility for Rural Digital Opportunity Fund support. *Id.* ¶ 286 (JA ___). In its long-form application, a winning bidder had to provide "extensive information," *Auction Order* ¶ 86 (JA ___), including a detailed description of the network that it intended to use to meet the Rural Digital Opportunity Fund public interest obligations, *see Auction Procedures Public*

---

[2] The Communications Act permits the Commission to "delegate any of its functions" to its staff (subject to enumerated exceptions), while preserving its right to "amend[]" or "rescind[]" the staff's "rule[s] or order[s]." 47 U.S.C. § 155(c)(1). The Commission has delegated review of short-form and long-form auction applications to its staff on prior occasions. *See, e.g., Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 5 (D.C. Cir. 2009).

*Notice* ¶¶ 301-311 (JA ___), and an explanation of how it would fund that network, *id*. ¶ 312 (JA ___). A long-form applicant also had to provide a letter from a bank acceptable to the Commission committing to issue an irrevocable stand-by letter of credit that would cover Rural Digital Opportunity Fund support payments until the winning bidder met deadlines for offering service in a specified number of areas. *Id*. ¶ 315 (JA ___).

After the Public Notice announcing that the Commission was "ready to authorize" support for a long-form applicant, 47 C.F.R. § 54.804(b)(6)(v), the applicant was required to submit the letter of credit, accompanied by a bankruptcy opinion letter from outside legal counsel stating that in a bankruptcy proceeding, the bankruptcy court would not treat the letter of credit or its proceeds as property of the long-form applicant's bankruptcy estate. *Auction Procedures Public Notice* ¶ 320 (JA __).[3]

The Commission delegated authority to the Bureau to conduct an "in-depth" review of a winning bidder's qualifications. *Auction Order* ¶ 86 (JA ___); 47 C.F.R. § 54.804(b)(2). The Commission specified that a winning bidder is technically and financially qualified for Rural Digital Opportunity Fund support if the Bureau, after reviewing its long-form application,

_____

[3] Throughout, when we refer to the letter of credit, we also refer to the accompanying bankruptcy opinion letter.

determines that the applicant "is reasonably capable of meeting its Rural Digital Opportunity Fund auction obligations in the specific areas where it has winning bids." *Auction Procedures Public Notice* ¶ 64 (JA ___). The Commission defined "reasonably capable" to mean the Bureau's "reasonable expectation that the applicant can meet those obligations." *Id.* The Commission "expect[ed] long-form applicants to expeditiously complete their applications and respond in a timely manner to staff requests for additional or missing information." *Id.* ¶ 286 (JA ___). The Commission emphasized that "[a]ll applicants will be subject to a thorough financial and technical review in both the short-form application stage and the long-form application stage prior to bidding and ultimately receiving support." *Auction Order* ¶ 77 (JA __).[4]

*Default*. If the Bureau determined that a long-form applicant was either ineligible or unqualified to receive Rural Digital Opportunity Fund support, or if the applicant failed to meet a document submission deadline, the applicant defaulted on its winning bids and would be subject to monetary forfeiture penalties under section 503 of the Act, 47 U.S.C. § 503. *Auction*

---

[4] "Winning bidders were required to show that they were both financially and technically qualified; a failure to establish qualifications on either of those factors was grounds for denial of the long-form application." *Order* ¶ 4 (JA __).

*Order* ¶ 114 (JA ___). "Agreeing to [a forfeiture] payment in the event of a default [was] a condition for participating in" the auction. *Auction Procedures Public Notice* ¶ 321 (JA __).

*The Auction.* LTD filed a short-form application to participate in the Rural Digital Opportunity Fund auction. It was one of 386 bidders found qualified to participate. *Order* ¶ 8 (JA __).

The first phase of the auction commenced on October 29, 2020. In the first round, LTD placed bids to provide gigabit broadband service to 2,223,682 locations in 16 states, which would have required $13,326,751,930 in Rural Digital Opportunity Fund support over 10 years. *Id*. At the time, LTD had a subscriber base of 15,000 customers across five states. *Id.* When the auction closed, LTD had placed winning bids to deploy gigabit broadband service to 528,088 locations in 15 states, amounting to $1,320,920,719 of Rural Digital Opportunity Fund support. *Id.* This was the largest amount for any of the 180 winning bidders in the auction. *Id.* ¶¶ 8-9 (JA ___).

*LTD's Long-Form Application*. LTD filed its long-form application on January 29, 2021. *Id*. ¶ 9 (JA ___). Bureau staff spoke with LTD representatives in March, June, and September of 2021, and March of 2022, about the need to submit technical information and financial data required by

the auction rules and procedures that had not been filed with LTD's long-form application. *Id.* ¶ 11 (JA ___).

On August 5, 2021 (seven months after the long-form application filing deadline), and again in November 2021, LTD submitted a revised description of the network that it planned to deploy, as well as other information about the technology it planned to use to meet its Rural Digital Opportunity Fund public interest obligations. *Id.* On both occasions, its documentation purported to cover only Arkansas, Louisiana, and Mississippi—states where LTD had not placed any winning bids—and even if it applied to the 15 states covered by LTD's winning bids, did not sufficiently address the application's technical deficiencies. *Id.*

The Bureau repeatedly contacted LTD through March 2022, but LTD did not submit any technical or financial materials in response to these inquiries. *Id.* After more than a year, the Bureau sent LTD a letter on May 26, 2022, that described the remaining deficiencies in LTD's long-form application, and gave LTD one last chance to address them. Letter from Trent Harkrader, Federal Communications Commission, to Corey Hauer, LTD Broadband, LLC (May 26, 2022) (*May 26 Letter*) (JA ___).

On June 27, 2022, LTD submitted additional technical and financial documents—this time, to explain its plans to finance and deploy systems in

Colorado, Illinois, Indiana, Minnesota, Missouri, North Dakota, Ohio, South

Dakota, Texas, and Wisconsin. LTD also informed the Commission that it

had—that same day—entered into two agreements with ████████████████

████████████████████ "ostensibly to enhance its financial position and

operational capabilities." Letter from Trent Harkrader, Federal

Communications Commission, to Corey Hauer, LTD Broadband, LLC

(August 10, 2022) at 4, 6 (*August 10 Letter*) (JA ___).

Upon review, the Bureau "determined that LTD ha[d] failed to

demonstrate that it [wa]s reasonably capable of meeting its [Rural Digital

Opportunity Fund] program obligations in the areas where it ha[d] winning

bids," and it "den[ied] LTD's long-form application." *August 10 Letter* at 1

(JA __).

*Financial requirements.* The Bureau determined that LTD's latest

"financial submissions d[id] not meet the [Rural Digital Opportunity Fund]

program requirements or demonstrate that LTD is reasonably capable of

meeting [its] performance obligations." *Id.* at 5 (JA ___). To start, the Bureau

observed that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* The Bureau noted that

13

LTD's financial data showed that "[t]o complete the [Rural Digital Opportunity Fund] program requirements, LTD plan[ned] to scale up its operation dramatically, with a projected asset growth of ██████ in just one year and ███████████ spent on [capital expenditures] in program Year Two alone." *Id.* The Bureau explained that "[t]o achieve this pace of growth, LTD would need capital far in excess of its current assets." *Id.*

The Bureau also found that even with LTD's updated "financial plan," which "included a new term sheet that purported to show that [LTD] could draw upon a ████████████████████████████████," LTD had not demonstrated that it had "access to sufficient capital to deploy the extensive network required" to serve its winning bid areas. *Id.* at 6 (JA __). The Bureau questioned whether LTD could meet the loan's prerequisites—for example,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████. *Id.*[5]

-----

[5] An Eligible Telecommunications Carrier is a telecommunications carrier designated (usually by a State) pursuant to section 214(e) of the Communications Act, 47 U.S.C. § 214(e), and that is thereby eligible to receive universal service support, *see* 47 U.S.C. § 254(e), including support from the Rural Digital Opportunity Fund. *See Auction Procedures Public Notice* ¶ 135 (JA _____).

The Bureau further determined that LTD did not meet its obligation under the Commission's auction rules and procedures to describe how it would fund construction of systems in each state where it was seeking Rural Digital Opportunity Fund support. *Id*. at 7 (JA ___). The Bureau explained that "LTD is presuming that deployment costs are equal, but that cannot be the case across the many different environments in which LTD had winning bids." *Id.*

Lastly, the Bureau found that LTD's "plans entail a high risk that LTD will not be able to cover all necessary debt payments over the life of any loans, thus jeopardizing its ability to fulfill the [Rural Digital Opportunity Fund] performance requirements." *Id.* at 7-8 (JA __).

*Technical qualifications*. The Bureau separately concluded that LTD's "more detailed technical response…still failed to demonstrate that it is reasonably capable of meeting program requirements." *Id*. at 8 (JA ___).

The Bureau pointed out that the auction rules and procedures required long-form applicants to "provide a detailed technology and system design description that demonstrates that the applicant is reasonably capable of meeting program requirements." *Id*. Yet, even with the assistance of a third-party consultant, LTD's supplemental technical filing "applie[d] an unrealistic one-size-fits-all approach" to deploying network facilities

throughout the "vast areas" covered by its winning bids. *Id*. In particular, the Bureau noted that LTD had submitted a technology and system design on pages labeled "*LTD Broadband Network Kansas*" to outline how it would provide "last-mile connectivity" in every state where it was seeking Rural Digital Opportunity Fund support. *Id.*

The Bureau also explained that LTD did not provide a "'more realistic and comprehensive answer'" to the Bureau's specific questions about LTD's Network Operations Center. *Id.* at 8-9 (JA __) (quoting *May 26 Letter* at 7 (JA ___)). Instead, LTD returned another "simplistic identification" of its Network Operation Center's "address and operational hours." *August 10 Letter* at 9 (JA __). The Bureau found that "this lack of specificity in designing, planning, deploying and operating a [Network Operations Center] to handle hundreds of thousands of customers across multiple states and time zones suggests that LTD has not adequately planned to support a network of this size." *Id*.

The Bureau concluded that "LTD's technical filings, even as augmented by its consultant, reflect a lack of understanding of how significantly their business needs to scale up to achieve equipment purchases, hiring, construction, deployment, maintenance, operations, and customer service for the sizeable network" covering LTD's winning bids. *Id.*

For all of these reasons, the Bureau found LTD's long-form application "unacceptable and den[ied] LTD's request for [Rural Digital Opportunity Fund] support." *Id*.

## II. THE *ORDER* ON REVIEW

On December 1, 2023, the Commission in the *Order* unanimously affirmed the Bureau's denial of LTD's long-form application.

1. To start, the Commission rejected LTD's argument that the Bureau applied "an incorrect standard of review and exceeded its discretion when denying LTD's application." *Order* ¶ 17 (JA ___). The Commission pointed out that in the *Auction Procedures Public Notice*, it had expressly "delegated authority to the Bureau to determine whether winning auction bidders should be authorized to receive…support based on a review of their post-auction long-form applications." *Id.* The Commission explained, "[t]he Bureau's role in reviewing long-form applications is more than a ministerial, box-checking exercise." *Id*. The Commission further pointed out that under the auction rules and procedures, "more extensive information" is filed with long-form applications than short-form applications so that winning bidders can "demonstrate to the Commission that they are legally, technically, and financially qualified to receive support." *Id.* (cleaned up). The Commission thus concluded that LTD had "ma[de] no compelling argument why" the

17

Bureau's review of its long-form application was "meaningless." *Id.* ¶ 24

(JA ___).

   2. The Commission found no merit in LTD's argument that "the only

proof it was required to provide of its financial ability…was the required

application certifications" in its long-form application and a "Letter of Credit

and bankruptcy opinion letter." *Id.* ¶ 26 (JA ___). The Commission explained

that it had never "indicate[d] that long-form applications are self-

authenticating" or that certifications made by the applicant "somehow render

the rest of the application…unnecessary." *Id.* Instead, the Commission

explained, it had repeatedly stated that the Bureau would both "'evaluate the

information submitted in the long-form application'" and "'rely'" on a bank's

"'willingness to issue the applicant a letter of credit'" in determining a

winning bidder's financial qualifications. *Id.* ¶ 27 (JA ___) (quoting *Auction

Procedures Public Notice* ¶ 64 (JA ___)). The Commission also pointed out

that the issuance of a letter of credit is contingent on the Bureau's

determination that the applicant is financially qualified for Rural Digital

Opportunity Fund support. *Order* ¶ 28 (JA ___).

   Lastly, the Commission "agree[d] with the Bureau's determination"

that LTD had not demonstrated that it is "financially qualified," *id.* ¶ 30

(JA ___), and it affirmed the entirety of the Bureau's findings about the

deficiencies in the financial information that LTD submitted with its long-form application, *id.* ¶¶ 31-37 (JA __).

3. Turning to LTD's technical qualifications, the Commission rejected LTD's contention that the Bureau should have found that LTD was qualified if it merely filed a network diagram certified by a professional engineer. *Id.* ¶ 38 (JA __). The Commission explained that argument, like LTD's similar argument about its financial qualifications, "conflates…certifications" in a long-form application "with the Bureau's review" of an application. *Id*.

The Commission also found that the Bureau was empowered to review LTD's technical qualifications even though the auction procedures "d[id] not specify each technical criterion." *Id.* ¶ 41 (JA ___). The Commission pointed out that it "established an iterative process for application review precisely so that" long-form applicants could resolve any deficiencies identified by the Bureau. *Id.* The Commission observed that "numerous applicants…took advantage of th[at] opportunity" and "successfully complete[d] their applications." *Id.* Yet, "[d]espite repeated requests from" the Bureau "over a year and a half," LTD never provided "specific and detailed operational infrastructure information" showing that it had the technical wherewithal to manage a "rapid expansion…into multiple states." *Id*. The Commission affirmed each of the Bureau's findings supporting its determination that LTD

was not technically qualified to meet its Rural Digital Opportunity Fund obligations. *Id*. ¶¶ 38-41 (JA __).

4. Lastly, the Commission upheld the Bureau's denial of LTD's entire long-form application. *Id*. ¶ 42 (JA __). The Commission observed that LTD had never raised the possibility of limiting its long-form application to cover something less than all of its winning bids; thus, the Commission found that "the Bureau had no basis to do so." *Id*. The Commission further observed that LTD in its filings did "not differentiate between areas…regarding financial preparedness" or "technical requirements." *Id*. Without such information, the Commission explained, the Bureau could not have determined where LTD could have qualified for Rural Digital Opportunity Fund support, even had LTD asked it to do so. *Id*.

## SUMMARY OF ARGUMENT

After reviewing LTD's long-form application and accompanying documents, the Bureau determined, and the Commission affirmed, that LTD was not reasonably capable of meeting its public interest obligations, *i.e.*, that it was not technically or financially qualified for Rural Digital Opportunity Fund support. LTD does not contend that these findings lack substantial evidence; rather, it asserts that the Commission was not authorized to engage in a substantive review of the application, that LTD lacked fair notice that the

agency would do so, that the Commission treated LTD unfairly relative to other winning bidders that submitted long-form applications, and that the Commission improperly denied LTD's entire long-form application. All of these arguments lack merit.

1. The Bureau followed the Commission's auction rules and procedures in reviewing LTD's long-form application. The Commission repeatedly told potential bidders in the Rural Digital Opportunity Fund auction that the Bureau would perform an "in-depth" review of post-auction long-form applications to determine whether winning bidders were qualified to receive support. The auction rules and procedures required long-form applicants to submit extensive information about their technical and financial qualifications—*e.g.*, a detailed description of an applicant's technology and system design in each state where it placed winning bids and an explanation of construction funding in each state. All of that information would have been entirely unnecessary if the Bureau were simply to have deferred to the applicant's self-certifications, a bank's willingness to issue the applicant a letter of credit, and a network diagram certified by a professional engineer. An "in-depth review" requires more than checking applications for completeness. And it is plainly not in the public interest to award universal

service funds to an applicant that has not shown that it is likely to fulfill its public interest obligations.

2. The Commission's auction procedures specified that a winning bidder is technically and financially qualified for Rural Digital Opportunity Fund support if the Bureau determines, after reviewing its long-form application, that it "is reasonably capable" of meeting its Rural Digital Opportunity Fund obligations "in the specific areas where it placed winning bids." That is the standard that the Bureau applied in reviewing LTD's long-form application. Even after the Bureau spoke with LTD about the deficiencies in its application, LTD never provided the information specified in the auction rules and procedures, and the high-level information that LTD did provide after more than a year of Bureau inquiries failed to establish that it was technically and financially qualified for support.

3. LTD had ample notice of the procedures that the Bureau would use and the standard that the Bureau would apply in reviewing LTD's long-form application. Prior to the auction, the Commission repeatedly told potential bidders that the Bureau would perform an in-depth review of long-form applications, and the agency provided substantial guidance about the type of information that must be included in a long-form application. Post-auction, the Bureau over the course of a year and a half spoke with LTD multiple

times and sent a letter to LTD describing the deficiencies in its long-form application. Any confusion LTD had about what had to be filed with a successful long-form application should have been dispelled through those communications.

4. The Bureau evaluated LTD's long-form application using the same procedures and applying the same standard that it used in reviewing every other long-form application. Regardless, LTD is not similarly situated to the long-form applicants discussed in its brief.

5. Finally, the Commission reasonably affirmed the Bureau's denial of LTD's long-form application in its entirety. Before the Bureau, LTD never raised the possibility of limiting its long-form application to something less than all of its winning bids, and the technical and financial information submitted by LTD did not permit the Commission to determine where LTD could have been qualified for Rural Digital Opportunity Fund support had LTD asked.

## STANDARD OF REVIEW

LTD bears a heavy burden to establish that the *Order* is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this 'highly deferential' standard of review, the court presumes the validity of agency action…and must affirm unless the

Commission failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93-94 (D.C. Cir. 2004); *see also NTCH, Inc. v. FCC*, 841 F.3d 497, 502 (D.C. Cir. 2016).

## ARGUMENT

**I.  LTD'S LONG-FORM APPLICATION WAS PROPERLY REVIEWED IN ACCORDANCE WITH THE COMMISSION'S AUCTION RULES AND PROCEDURES.**

### A.  The Bureau Properly Performed An In-Depth Review Of LTD's Long-Form Application.

LTD asserts that the Bureau did not follow the Commission's auction rules and procedures in reviewing its long-form application, and that the Commission erred in upholding the Bureau. LTD Br. 31-39. Although LTD acknowledges that "the long-form process undoubtedly aims to prevent unqualified winners from receiving funding," *id*. at 34, it contends that the Bureau improperly gave a "wholly independent and deeply probing look" at the "disclosures and certifications" in its long-form application, instead of simply "defer[ring] to" its "certifications and outside-expert review," *id.* at 27.

1.  LTD's notion of how the Bureau was supposed to review long-form applications in the Rural Digital Opportunity Fund auction is contradicted by the Commission's auction rules and procedures, and is at odds with the

agency's obligation to be a "prudent guardian of the public's resources." *Order* ¶ 16 (JA ___) (cleaned up).

a. When the Commission established the "basic framework and requirements" for the Rural Digital Opportunity Fund auction, it determined that before winning bidders could receive support they would be "required to submit" long-form applications that included "extensive information detailing" their technical and financial qualifications to allow an "'in-depth review' of their qualifications." *Auction Order* ¶ 86 (JA ___); *see id.* ¶ 79 (JA ___) (explaining that the "long-form post auction process…will provide an in-depth extensive review of the winning bidders' qualifications"). When the Commission released the auction procedures, it reiterated that the "in-depth long-form application process will…minimize the risk of authorizing an unqualified applicant." *Auction Procedures Public Notice* ¶ 97 (JA ___). The Commission thus made clear from the start that "[t]he Bureau's role in reviewing long-form applications is more than a ministerial, box-checking exercise." *Order* ¶ 17 (JA ___).

As this Court has recognized in prior auction cases, the Commission uses "more detailed" long-form applications to determine a winning bidder's eligibility for whatever the bidder won in the auction—whether spectrum licenses, bidding credits, or in this case, universal service subsidies. *See*, *e.g.*,

*Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 198 (D.C. Cir. 2022) ("An applicant that wins a license in the auction and wishes to obtain bidding credits must then submit a more detailed, long-form application that the agency uses to assess whether the applicant is eligible for bidding credits."); *Alvin Lou Media,* 571 F.3d at 4 ("After the auction [the FCC] would review in detail only the winning bidder's application."); *id.* ("The winning bidder would file a long-form application,…which would be reviewed for compliance with all relevant requirements, including technical feasibility," and "[a] permit or license would be granted only after…the Commission was satisfied the applicant was qualified."). LTD's view that long-form application review should have been "relaxed," LTD Br. 32, is contrary to the well-understood function of a long-form application.

LTD's conception of long-form application review also flies in the face of the ordinary meaning of the term "review," which is "to go over or examine critically or deliberately." Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/review. If a long-form application cannot be "assessed on the merits," as LTD contends, LTD Br. 37, then it is not "reviewed" at all. For the Bureau to "examine" a long-form application "critically or deliberately," it must be able to analyze the contents of the application. An "in-depth review of long-form applications" thus

requires the Bureau to evaluate applications "*both* for completeness and compliance with the Commission's rules *and* to determine whether an applicant [i]s financially and technically qualified for support." *Order* ¶ 5 (JA ___) (emphasis added). LTD's "[r]elaxed…[s]tandard," LTD Br. 32, would effectively excise the word "review" from the Commission's auction rules and procedures.

b. LTD's highly constrained view of the long-form application review process also takes no account of the "extensive information" that the Commission required winning bidders to submit "detailing their respective qualifications." *Auction Order* ¶ 86 (JA ___); *see Order* ¶ 26 (JA ___).

The rules and procedures for the Rural Digital Opportunity Fund auction required every winning bidder in its long-form application to "certify" that it "will meet the relevant public interest obligations" for the services covered by its winning bids, "certify" that "it is financially and technically capable of meeting" those "public interest obligations…in the geographic areas" where it seeks support, *Auction Procedures Public Notice* ¶¶ 298, 299 (JA ___), and submit a "description of its technology design" that included a "network diagram…certified by a professional engineer," *id.* ¶ 309 (JA ___).

In addition to those certifications, the Commission required long-form applicants to submit "extensive information detailing" their technical and financial qualifications. *Auction Order* ¶ 86 (JA __). For instance, a long-form applicant had to submit a "detailed description of its technology and system design" that "describe[d] the network to be built or upgraded, demonstrate[d] the project's feasibility," and "include[d] [a] network diagram certified by a professional engineer" "for each state in which winning bids were made." *Auction Procedures Public Notice* ¶ 303 (JA ___); 47 C.F.R. § 54.804(b)(2)(iv). The Commission "expected" a long-form applicant to provide, at a minimum:

- Technical information about its "overall network design"—*e.g.*, a description of "the design and features that it proposes to implement that will: improve reliability (such as redundancy) for equipment, links, and software; dual homing; and multi-homing connectivity." *Auction Procedures Public Notice* ¶ 306 (JA ___);

- A "project plan that describes a network build-out schedule" which, among other requirements, "include[s] when (month, quarter or projected date) and where (geographic description, county, city, town, [census block group], census tract…)." *Id.* ¶ 307 (JA ___).

- A description of the applicant's network management and operations—*e.g.*, its "plans for monitoring network usage/capacity, performance, congestion, and other parameters." *Id.* ¶ 308 (JA ___).

- A "network diagram…certified by a professional engineer." *Id.* ¶ 309 (JA ___).

To help long-form applicants prepare their applications, the Commission also provided two diagrams illustrating how an applicant could present a "detailed description of its technology and system design" that would establish its technical qualifications for Rural Digital Opportunity Fund support. *Id.* ¶ 303 (JA ___).

The Commission likewise required long-form applicants to submit extensive financial information, including a detailed "descri[ption]" of how they would fund construction "in each state" where they placed winning bids. *Id.* ¶ 312 (JA __). That description had to "include the estimated project costs for all facilities that are required to complete the project" "broken down" at the "state level"; "specify how Rural Digital Opportunity Fund support and other funds, if applicable, will be used to complete the project"; and "include financial projections demonstrating that the long-form applicant can cover the necessary debt service payments over the life of any loans." *Id.*; *see* 47 C.F.R.

§ 54.804(b)(2)(vi). If a long-form applicant had not submitted audited financial statements with its pre-auction short-form application, it also was required to submit financial statements from the prior fiscal year that were audited by an independent certified public accountant. *Auction Procedures Public Notice* ¶ 318 (JA ___).

LTD does not explain what purpose these disclosures would serve if the Bureau could not responsibly analyze them. Under LTD's conception of long-form review, the Bureau could at most verify that the applicant filed the right documents. *Order* ¶ 26 (JA ___). For instance, the Bureau could check to make sure that the applicant filed a document titled "Project Funding Description," but it could not examine whether the "Project Funding Description" document included the "estimated project costs for all facilities that are required to complete the project" "broken down" at the "state level," even though the auction procedures state that information "must" be filed with a long-form application. *Id.*; *Auction Procedures Public Notice* ¶ 312 (JA ___). Here, for example, the Bureau would have had to accept LTD's Project Funding Description—no questions asked—even though it indisputably "d[id] not provide differentiated anticipated costs and related funding for each of the areas" where LTD was seeking support and relied on

the "unreasonable" presumption that "deployment costs are equal across all states and rural regions within each state." *Order* ¶ 34 (JA ___).

Underscoring this point, the Commission in the *Auction Procedures Public Notice* stated, "If a long-form applicant submits a technology and system design description that lacks sufficient detail to demonstrate that [it] has the technical qualifications to meet the relevant Rural Digital Opportunity Fund obligations, [it] will be asked to provide further details about its proposed network." *Auction Procedures Public Notice* ¶ 303 (JA ___). The Bureau cannot find that a description "lacks sufficient detail" unless it first evaluates whether the description establishes the applicant's technical qualifications. *See also id.* ¶ 286 (JA ___) ("We expect long-form applicants to expeditiously complete their applications and respond in a timely manner to staff requests for additional or missing information.").

2. LTD contends that because the Commission's auction procedures specified that an applicant must show that it is "'reasonably capable'" of meeting its public interest obligations, LTD Br. 32 (quoting *Auction Procedures Public Notice* ¶ 64 (JA ___)), the Commission must "give[] deference to the applicant's certifications and the independent judgment of a bank and engineer," LTD Br. 27. But the Commission made clear that "'[r]easonably capable' refers to the *Commission staff's* reasonable

expectation that the applicant can meet [its] obligations." *Auction Procedures Public Notice* ¶ 64 (JA ___) (emphasis added). Contrary to LTD's view, LTD Br. 27, 32, the Commission nowhere suggested that the staff's reasonable expectation was to be based on deference to the applicant's (here, largely unsupported) assertions about its capabilities.

Moreover, "reasonably capable" specifies what a long-form applicant must show in its application, not how the Bureau must evaluate its application. *Contra* LTD Br. 32-33. The ordinary meaning of "reasonable," is "not extreme or excessive," or "moderate" and "fair." Merriam Webster Dictionary, available at https://www.merriam-webster.com/dictionary/reasonable; *see also* Reasonable, Black's Law Dictionary (11th Ed. 2019) (defining "reasonable" as "[f]air, proper, or moderate under the circumstances; sensible."). By qualifying "capable" with "reasonably," the Commission was demanding something less than absolute assurance that a long-form applicant would meet its Rural Digital Opportunity Fund public interest obligations. Put another way, "[a] finding that an applicant is not reasonably capable…indicate[s] that based on the totality of circumstances, it is more likely than not that the long-form applica[nt] is not qualified to meet the relevant public interest obligations." *Id.* ¶ 123 n.291 (JA ___). The Commission, however, did not limit the extent

to which the Bureau could examine a long-form application to determine whether the applicant was "reasonably capable" of fulfilling its public interest obligations, as LTD contends, LTD Br. 32-33.

The Commission's directive that the Bureau will not make a "'definitive finding'" that an applicant "'will meet the public interest obligations,'" because it would be "'unduly burdensome' and 'potentially irrelevant'" to make such a finding, LTD Br. 34-35 (quoting *Auction Procedures Public Notice* ¶ 125 (JA__)), simply illustrates that the Commission directed the Bureau to evaluate whether the applicant was "reasonably capable" (*i.e.*, more likely than not) of meeting its obligations, *Auction Procedures Public Notice* ¶ 123 n.291 (JA ___).

Indeed, the Commission explained that because an applicant "has several years to deploy its network and may change its plans as conditions on the ground or technology continue to evolve," the Bureau could "not mak[e] a definitive finding that the applicant will *meet* the public interest obligations." *Auction Procedures Public Notice* ¶ 125 (JA ___) (emphasis added). But the fact that an applicant might later change its network design does not bar the Bureau from examining a long-form application to determine whether the applicant has shown that it is reasonably capable of meeting its public interest obligations post-auction and will likely continue to be in the future. Agencies

make such "predictive judgments" in the normal course, and this Court's "review of the FCC's exercise of its predictive judgment is particularly deferential." *Melcher v. FCC*, 134 F.3d 1143, 1151 (D.C. Cir. 1998); *see Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("Where…the FCC must make predictive judgments about the effects of increasing subsidies, certainty is impossible."). In fact, agencies make predictions because they cannot make definitive, factual determinations of future behavior based on the evidence in front of them. *See Melcher*, 134 F.3d at 1152 ("Where…the FCC must make judgments about future market behavior with respect to a brand new technology, certainty is impossible."); *FCC v. WNCN Listener's Guild*, 450 U.S. 582, 594 (1981) ("the Commission's decisions must sometimes rest on judgment and prediction rather than pure factual determinations"). Here, the Commission (and its staff) were not prohibited from denying an application simply on the baseless hope that the applicant might become reasonably capable of meeting its public interest obligations later on.

3. LTD contends that review of its long-form application should have "consist[ed] largely of verifying that independent experts have endorsed [the company's] plans." LTD Br. 36. Thus, "[r]ather than making its own independent judgment concerning [LTD's] financial qualifications," LTD

contends that the Bureau must "trust the expertise of the bank" that is willing to issue a letter of credit, and "[w]ith respect to [LTD's] technical qualifications," the Bureau must "trust the independent judgment and expertise of [the company's] engineer." *Id*. at 35-36. The Commission reasonably determined that neither representation could by itself establish a long-form applicant's technical and financial qualifications.

a. To start, the Commission never "indicate[d] that long-form applications are self-authenticating through certifications." *Order* ¶ 26 (JA __). A certification is an attestation by the signatory that the statement being certified is accurate and complete. *See* Black's Law Dictionary (11th ed. 2019) (defining "certify" as "To authenticate or verify in writing"; "To attest as being true or as meeting certain criteria."). It serves to focus the applicant on the gravity and importance of the statements in the application. *See Auction Order* ¶ 72 (JA ___) (explaining that requiring certifications "is an appropriate screening process to ensure serious participation" in the auction). The Commission accordingly warned that each long-form applicant "should take care to review its resources and its plans before" certifying that "it is financially and technically capable of meeting the relevant public interest obligations" for the services covered by its winning bids "in the geographic areas in which it seeks support," because if an applicant made a

35

false certification to the Commission, it "expose[d] itself to liability" under the FCC's rules. *Auction Procedures Public Notice* ¶ 298 (JA ___). But a certification does not definitively establish that what is being certified is correct as a matter of fact or law. *Global Crossing Telecomms. Inc. v. FCC*, 259 F.3d 740, 746 (D.C. Cir. 2001). The fact that LTD certified that it is "financially and technically qualified to meet the public interest obligations," *Auction Order* ¶ 72 (JA __), thus did not prevent the Bureau from verifying the substance of the certifications by performing a more "in-depth" review of LTD's long-form application, *Auction Procedures Public Notice* ¶ 97 (JA ___).

b. The Commission also never said that it would forego its own analysis of a long-form applicant's financial qualifications. *Order* ¶ 27 (JA __). Paragraph 64 of the *Auction Procedures Public Notice*, upon which LTD relies, LTD Br. 35, states that "Commission staff will evaluate the information submitted in the long-form application *and* will rely on an eligible bank's willingness to issue the applicant a letter of credit to determine whether an applicant is reasonably capable of meeting its Rural Digital Opportunity Fund Auction obligations in the specific areas where it has winning bids," *Auction Procedures Public Notice* ¶ 64 (JA ___) (emphasis added). Thus, the Commission made clear that the Bureau "will

evaluate" the long-form application in addition to "rely[ing]" on the letter of credit commitment letter. *Order* ¶ 27 (JA ___).

Moreover, if the letter of credit commitment letter were alone sufficient to demonstrate an applicant's financial qualifications, "the financial review portion of application processing would merely consist of checking certifications and confirming" that the applicant submitted a letter of credit commitment letter. *Id*. ¶ 28 (JA ___). The other documents that must be filed with the long-form application—notably, audited financial statements and a detailed project funding description—would be "unnecessary." *Id.* ¶ 26 (JA ___).

Further, under the auction rules and procedures, a long-form applicant does not actually "obtain" a letter of credit from a bank until after the Bureau has completed its review of the application and found it "ready-to-authorize." *Auction Procedures Public Notice* ¶ 319 (JA ___). The Bureau thus could not rely solely on a letter of credit to establish that LTD was financially qualified because the Bureau had to determine that LTD was financially qualified (and its application "ready to authorize") *before* the bank would issue a letter of credit. *Order* ¶ 28 (JA ___).

Lastly, a letter of credit serves a different function than the Bureau's review of an applicant's financial qualifications. The letter is akin to

insurance: It enables the Commission to "immediately reclaim" universal service support when a recipient "is not furthering the objectives of universal service by complying with the Commission's rules or requirements." *Connect America Fund*, 31 FCC Rcd 5949, 5989-99 ¶¶ 120 (2016). A letter of credit thus "provide[s] appropriate protection for Rural Digital Opportunity Fund support." *Auction Order* ¶ 96 (JA __).[6] Accordingly, the Commission "rel[ies] on the expertise of banks' experience in managing letters of credit, guaranteeing payment, and ensuring security for the Commission and ultimately the [Universal Service] Fund." *Auction Order* ¶ 112 (JA ___). But the Commission still must review a long-form applicant's financial qualifications, post-auction, to avoid distributing support to an applicant who is unlikely to meet its public interest obligations over the ten-year term of the Rural Digital Opportunity Fund. *Auction Procedures Public Notice* ¶ 123 n.291 (JA ___). Here, for example, the Bureau determined, after reviewing LTD's term sheet with ███████, that "LTD would not be able to cover

---

[6] In the Rural Digital Opportunity Fund auction, the letter of credit only partially covered all support payments, as LTD acknowledges, LTD Br. 12. After the second year, a funding recipient never had to maintain a letter of credit for the full amount of support that it had received. *See Auction Order* ¶¶ 98-101 (JA ___). Support recipients that miss deadlines to deploy services to a specified number of locations, which begin at the end of the third year of support, must increase the value of their letters of credit, but up to a maximum of three years of support. *See id.*

all necessary debt payments over the life of any loans, thus jeopardizing its ability to fulfill the [Rural Digital Opportunity Fund] performance requirements." *Order* ¶ 36 (JA ___).

c. Likewise, the Commission never said that it would forego its own analysis of a long-form applicant's technical qualifications. LTD overstates the significance of the professional engineer's certification of a network diagram. LTD Br. 35-36. Some applicants, including LTD, *Order* ¶ 39 (JA ___), did not have in-house engineering expertise. The Commission thus required that a professional engineer certify the diagram to improve the likelihood that applicants would provide accurate and sufficiently detailed technical information about the networks that they planned to construct in their long-form applications. The Commission and its staff could then assess whether the network described in the diagram supported a determination that the long-form applicant was technically qualified for Rural Digital Opportunity Fund support.

The network diagram also was only one component of the "detailed description of" the "technology and system design" that had to be filed with a long-form application. *See* pp. 28-29, above. A long-form applicant also had to provide a build-out schedule and a description of its network management and ongoing operations, neither of which has to be certified by a professional

engineer. *Auction Procedures Public Notice* ¶¶ 307-308 (JA ___). If the certified network diagram by itself established a long-form applicant's technical qualifications, the other required information would be unnecessary.

4. Lastly, LTD contends that the Commission intended to rely on "robust safeguards on the backend," "rather than frontend certainty," to "ensure that unqualified bidders do not participate in its auctions or receive support." LTD Br. 38-39. To the contrary, the Commission "expect[ed] the more in-depth long-form application process," *in addition to* "the threat of forfeiture if a winning bidder defaults," to "minimize the risk of authorizing an unqualified applicant." *Auction Procedures Public Notice* ¶ 97 (JA ___).

The "safeguards" that LTD describes (withholding Rural Digital Opportunity Fund support payments and "claw[ing] back" support) only come into play *after* a recipient of Rural Digital Opportunity Fund support fails to meet its public interest obligations. As the Commission explained, "it is not in the public interest to risk awarding support to an applicant that Commission staff believes is likely to default or be unable to fulfill its obligations." *Auction Procedures Public Notice* ¶ 123 n.291 (JA ___). It is well-established that the Commission can impose effective safeguards—here, frontend review of a winning bidder's qualifications—to protect limited

universal service funds. *Rural Cellular Association*, 588 F.3d at 1102-03 (cataloguing cases).

Indeed, identifying an unqualified winning bidder as early as possible avoids delaying broadband deployment, because if the Commission denies its long-form application, the areas covered by its winning bids will be eligible for alternative sources of funding. Other federal and state programs distribute funds to rural areas to support broadband. To promote efficient use of broadband funding, some federal agencies (including the FCC) will not award support to an area that is already receiving funds from another program.[7] If "it is more likely than not that the long-form applica[nt] is not qualified to meet the relevant public interest obligations," *Auction Procedures Public*

---

[7] *See, e.g.*, Department of Commerce, National Telecommunications and Information Administration, Broadband Equity, Access, and Deployment (BEAD) Program Notice of Funding Opportunity at 36-37 & n.52 (May 13, 2022),https://broadbandusa.ntia.doc.gov/sites/default/files/2022-05/BEAD%20NOFO.pdf (BEAD Program Notice of Funding Opportunity)(explaining that any location that is already subject to an enforceable commitment for the deployment of qualifying broadband cannot be treated as unserved or underserved). Department of Agriculture, Rural Utilities Service, Corrected Notice of Funding Opportunity for the Community Connect Grant Program for Fiscal Year 2023, 88 Fed. Reg. 87750, 87751 (Dec. 19, 2023) ("Areas receiving, or areas that have received final approval for, other federal funding to construct terrestrial facilities providing at least 10/1 Mbps service in the project Proposed Funded Service Area as of the date of this notice, and which have been reported to the agency, are ineligible.").

*Notice* ¶ 123 n.291 (JA ___), denying its application, rather than risking that the applicant will default later, may be the best course, because the areas covered by the application will immediately become eligible for other sources of broadband funding. The Commission's predictive judgment about how to best avoid delaying broadband deployment is accorded substantial deference by the Court. *See Rural Cellular Association*, 588 F.3d at 1105.

### B.   The Bureau Reviewed LTD's Long-Form Application Under The Correct Standard.

LTD asserts its long-form application was subject to a "more exacting review" than provided by the auction procedures. LTD Br. 39-45. Some of LTD's arguments supporting that assertion are waived; they all lack merit.[8]

1. LTD first criticizes the Commission for "assert[ing] that…heightened review is appropriate unless the applicant shows that it is unduly burdensome and irrelevant," LTD Br. 40 (citing *Order* ¶ 23 (JA __)), even though, LTD contends, the agency had previously said that such review "would be unduly burdensome and potentially irrelevant *as a general matter*," LTD Br. 40 (citing *Auction Procedures Public Notice* ¶ 125 (JA__)).

─────────────────────

[8] LTD contends that the Commission adopted a new standard for reviewing long-form applications after the Rural Digital Opportunity Fund auction because control of the agency changed after the 2020 presidential election. *See* LTD Br. 2, 15-16, 20-21. But denial of LTD's long-form application received the support of all five FCC Commissioners.

At the outset, LTD did not present that argument to the Commission, so it is not properly before this Court. Section 405(a) of the Act, 47 U.S.C. § 405(a), provides that the filing of a petition for reconsideration with the Commission is a "condition precedent to judicial review" of any "questions of fact or law upon which the Commission…has been afforded no opportunity to pass." LTD did not raise this argument in its Application for Review (in fact, it could not have, since it concerns a statement made in the *Order*), and it did not file a petition for reconsideration of the *Order*. *See In re Core Commc'ns, Inc.*, 455 F.3d 267, 276-77 (D.C. Cir. 2006) ("[E]ven when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file 'a petition for reconsideration' with the Commission before it may seek judicial review." (quoting 47 U.S.C. § 405(a)). Thus, the argument is waived.

Even if the argument had not been waived, it fails, because LTD misreads the *Order*. LTD's Application for Review argued that in-depth review of long-form applications was "'potentially irrelevant' and 'unduly burdensome'" because "an applicant may alter its plans 'as conditions on the ground' continue to evolve." LTD Application for Review at 10 (quoting *Auction Procedures Public Notice* ¶ 125 (JA ___)) (JA ___). In response, the Commission pointed out that LTD had not identified any "change" in the

"conditions in its situation" that would cause the Commission to reconsider the Bureau's already-completed review of LTD's long-form application. *Order* ¶ 23 (JA __). Indeed, LTD did not challenge any of the specific technical and financial findings underlying the Bureau's decision to deny its long-form application. *Id*. ¶¶ 30, 38 (JA ___). Thus, the Commission explained, "[w]hile review might be *potentially* irrelevant in some circumstances, LTD's long-form application," which the Bureau had already reviewed and properly found deficient, "[wa]s not one of them." *Id.* ¶ 23 (JA __).

Accordingly, there was no reason for the Commission to ignore the Bureau's findings, which the Commission found to be entirely correct. *Id.* ¶¶ 31-41 (JA ___). For example, the Commission agreed with the Bureau that "LTD's financial submissions indicated that [the company] was not reasonably capable of meeting the relevant public interest obligations for the [Rural Digital Opportunity Fund] program." *Id.* ¶ 37 (JA __). Among other things, "LTD would require an enormous infusion of capital to deploy as required," *id*. ¶ 32 (JA ___), but LTD did not appear to meet the "initial prerequisites" for a loan "[as] specified in the term sheet it submitted," *id*. ¶ 33 (JA ___). Also, LTD's "project funding description [did] not provide differentiated anticipated costs and related funding for each of the areas for

which LTD [wa]s seeking support," even though the auction rules and procedures require that information. *Id*. ¶ 34 (JA ___). And LTD "attempted to demonstrate its financial qualifications based upon numerous assumptions that belie both the Bureau's experience evaluating other applications and common sense." *Id*. ¶ 35 (JA ___).

The Commission also agreed with the Bureau that LTD had not established that it "was reasonably capable of meeting the technical requirements to deploy and operate gigabit service to all the proposed locations in the time required and within the [Rural Digital Opportunity Fund] performance standards." *Id.* ¶ 41 (JA ___). For example, instead of submitting the "required specific and localized project designs" required by the auction procedures, LTD "applied an unrealistic one-size-fits-all approach for the vast areas where it would be required to deploy," including "providing a brief template labeled for one state that presumably was intended to outline last mile connectivity for all of its winning bid areas." *Id*. ¶ 40 (JA ___). LTD also "fail[ed] after specific inquiry to detail a comprehensive network operations and customer support infrastructure." *Id*. "Issues such as these in LTD's submissions," the Commission concluded, "indicate that LTD is not reasonably capable of supporting a network of considerable size and

complexity that meets the [Rural Digital Opportunity Fund] performance requirements." *Id*.

2. Next, LTD contends that the Commission gave a "more exacting review" to LTD's long-form application because LTD is a "smaller compan[y]" that was "successful in the auction." LTD Br. 39-40. There is no dispute that LTD had a relatively small footprint, a small customer base, and no experience operating a large network yet, even after post-auction defaults, *see Order* ¶ 10 (JA ___), its winning bids encompassed "hundreds of thousands of locations in 11 states," *id.* ¶ 23 (JA __). The Bureau reasonably determined that LTD's size relative to its winning bid amounts warranted a "further inquiry into whether LTD should be authorized for support." *Id*. After all, when it adopted the auction procedures, the Commission had directed the Bureau, in evaluating long-form applications, to "verify that the applicant has the plans and capability to scale [its] network if necessary" to meet its public interest obligations. *Auction Procedures Public Notice* ¶ 76 (JA ___); *see Order* ¶ 18 (JA __).

LTD's own financial data showed that "to complete the [Rural Digital Opportunity Fund] program requirements, LTD plan[ned] to scale up its operation dramatically, with a projected asset growth of ███████ in just one year and ██████████ spent on [capital expenditures] in program Year

Two alone." *August 10 Letter* at 5 (JA ___). The Bureau observed that "[t]o achieve this pace of growth, LTD would need capital far in excess of its current assets." *Id.* Applying the "reasonably capable" standard, the Bureau simply determined that LTD had failed to establish that it had the "financial ability to complete a project of this size in the time required." *Id.*; *Order* ¶ 23 (JA ___).

3. LTD also provides "examples" of how the Commission allegedly "flyspecked" its long-form application: (1) the Commission "speculated" improperly that LTD would not be able to meet the requirements of its financing term sheet, LTD Br. 41-42, (2) the Commission wrongly "criticized both LTD Broadband's decision to use a third-party engineer and the timing of the hiring," *id.* at 42-43, and (3) the Bureau "focused intently" (and unnecessarily) on LTD's "failure to submit an adequate plan for its Network Operations Center," *id.* at 43-44.

These aspects of the Commission's review of LTD's application did not constitute arbitrary flyspecking; instead, they were an unexceptional product of the agency's obligation "to tailor [its] review to the circumstances" of LTD's long-form application, "'based on the totality of information.'" *Order* ¶ 29 (JA ___) (citation omitted). And none call into question the reasonableness of the Commission's decision.

To start, LTD has waived its argument that the Bureau had neither the authority nor the expertise to evaluate LTD's term sheet with █████████, LTD Br. 41-42, because LTD never raised that argument before the Commission. 47 U.S.C. § 405(a); *NTCH*, 841 F.3d at 507-08 (section 405(a) bars a court's consideration of an issue that "was never reasonably flagged for the FCC").

The argument fails on the merits anyway. The Commission directed the Bureau to perform an in-depth review of long-form applications, *see* pp. 8-10, above, and as this Court has recognized, interpreting financial data accompanying long-form applications is an unremarkable part of the Commission's responsibilities. For example, in *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1032-33, 1034-35 (D.C. Cir. 2017), and *Northstar Wireless*, 38 F.4th at 210-12, 213-15, the Court upheld the Commission's detailed analysis of loan agreements and other financial data submitted with two long-form applications to determine eligibility for bidding credits. As here, the Commission assessed whether the applicants could satisfy the terms in their loan agreements. *See SNR Wireless*, 868 F.3d at 1040 (describing the applicants' need to "scrambl[e] to build a national network in the space of less than five to seven years in the quixotic mission of generating enough revenue to pay back their multibillion dollar loans").

Next, LTD complains that the Commission "criticized" it for hiring an engineer late in the application process. LTD Br. 42-43. But the Commission reasonably inferred that "the engagement of a consultant so late in the long-form application process may suggest a last-ditch effort to obtain necessary technical expertise for the sole purpose of [obtaining] the Bureau's authorization of support despite the absence of such expertise in-house at LTD." *Order* ¶ 39 n.83 (JA ___). The Commission also observed that there would be "no guarantee that the consultant would be retained throughout the deployment when LTD would be required to provide service across the vast area of its winning bids." *Id*. In any event, even with the assistance provided by the outside consultant, the Commission found that LTD's technical filings "still failed to demonstrate that it was reasonably capable of meeting" its public interest obligations. *Id*. ¶ 39 (JA ___).

Lastly, LTD contends that the Bureau required it to provide more information about its Network Operations Center (*i.e.*, its customer service operations) than the auction procedures specified. LTD Br. 43-44. Not so. Paragraph 308 of the *Auction Procedures Public Notice* (JA __), set a floor, not a ceiling, on the information that a long-form applicant was required to submit in providing a "detailed description" of its "network management and on-going operations." As the Commission stated, it was "describ[ing] the

types of information [it] would expect a long-form applicant to include, *at a minimum*, in a detailed description of its technology and systems design." *Id.* ¶ 304 (JA ___) (emphasis added).[9]

## II. LTD HAD FAIR NOTICE OF THE STANDARD THAT THE COMMISSION WOULD EMPLOY IN REVIEWING ITS LONG-FORM APPLICATION.

LTD had ample notice of how the Bureau would evaluate its long-form application. LTD "received, or should have received, notice of the agency's interpretation" of its auction rules and procedures "in the most obvious way of all: by reading the regulations." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

When the Commission established the Rural Digital Opportunity Fund, it repeatedly told potential bidders that it would perform an in-depth review of long-form applications, and it provided substantial guidance about the type of information that must be included in a long-form application. *Auction Order* ¶¶ 86-113 (JA __). The Commission also codified those requirements

_____

[9] Perplexingly, LTD asserts that denial of its long-form application was improper for the reasons stated in FCC Commissioner Brendan Carr's dissent from the Commission's affirmance of the Bureau's denial of Starlink's long-form application. LTD Br. 44-45. But Commissioner Carr did not raise any concerns about the Commission's denial of LTD's long-form application, which received his support as well as those of his four colleagues.

in its rules. 47 C.F.R. § 54.804(b). And, prior to the auction, the Commission issued a Public Notice that spelled out the specific technical and financial information that a winning bidder would have to submit with its long-form application. *Auction Procedures Public Notice* ¶¶ 294-314 (JA ___). For instance, the Commission spent five paragraphs—including 22 bullet points and two diagrams—explaining how a long-form applicant must file a "detailed description of its technology and system design." *Id.* ¶¶ 306-311 (JA ___).[10] Those authorities gave LTD ample notice of the procedures that the Bureau would use and the standard that the Bureau would apply in reviewing long-form applications. This is not a case in which a regulated entity required "extraordinary intuition or…the aid of a psychic" to understand what was required of it. *United States v. Chrysler Corp.*, 158 F.3d 1350, 1357 (D.C. Cir. 1998).

LTD nonetheless argues that the Commission failed to provide a "comprehensible standard" that gave "affected parties *ex ante* guidance," LTD Br. 47, about how the agency would decide that a winning bidder was "ineligible or unqualified" for Rural Digital Opportunity Fund support, *id.* at

---

[10] The Commission also provided educational resources, including a tutorial and template to assist applicants. https://www.fcc.gov/document/auction-904-info-posted-technical-detail-and-loc-commitments-due-216.

49. That argument is belied by the Commission's auction rules and procedures, which spell out "what information" a long-form applicant had to submit in order to establish that it was "reasonably capable of meeting program requirements" and thus technically and financially qualified for support. *Order* ¶ 29 (JA __); *see*, *e.g., Auction Procedures Public Notice* ¶¶ 301-311 (JA ___) (description of technology and system design); *id*. ¶ 312 (JA ___) (description of funds and project costs); *Auction Order* ¶ 90 (technology and system design), *id*. ¶ 91 (description of project funding); 47 C.F.R. § 54.804(a)(4), (7). Reviewing all of that guidance, any reasonable potential bidder in the Rural Digital Opportunity Fund auction could have discerned the factors the Commission would consider in evaluating its technical and financial qualifications, should it place winning bids.

Moreover, over the course of a year and a half, the Bureau "spoke with LTD" multiple times about "the insufficiencies" in its long-form application and it "answered LTD's questions regarding program requirements." *Order* ¶ 11 (JA __). Also, before it denied the application, the Bureau sent LTD a letter "extensively detailing" its "deficiencies," and the Bureau provided LTD "a final opportunity to demonstrate its qualifications for support"—all to no avail. *Id.*; *see May 26 Letter* at 3-9 (JA ___).

Even if LTD were under the misimpression that its long-form application would be given minimal review by the Bureau, once the Bureau started asking detailed questions, LTD was on notice that it would have to provide more and better information. In short, any pre-auction confusion about long-form filing requirements should have been cleared up by months of post-auction Bureau inquiry. Here, the Bureau provided LTD the type of "pre-enforcement effort[] to bring about compliance" that this Court found "will provide adequate notice." *General Electric*, 53 F.3d at 1329; *see Northstar Wireless*, 38 F.4th at 220 (long-form applicant had fair notice because it was provided an opportunity to cure deficiencies in its application that had been identified by the Commission).

In fact, the Commission "established an iterative review process" "precisely so" that information missing from long-form applications "could be discussed and resubmitted." *Order* ¶ 41 (JA ___). "[N]umerous applicants…took advantage of th[at] opportunity" and "successfully complete[d] their applications." *Id*. In contrast, "[d]espite repeated requests from staff over a year and a half," LTD never provided the specific and detailed technical and financial information required by the auction rules and procedures, which is why the Bureau finally denied its long-form application. *Id.* "If a [party regulated by the FCC] ignores or fails to understand

reasonably comprehensible requirements, [it] cannot be heard to complain about lack of notice." *Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551, 1558 (D.C. Cir. 1987); *see Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 296 F.3d 1120, 1132 (D.C. Cir. 2002) (when the petitioner "persisted in its ways despite clear and repeated warnings from the relevant government agency," it "c[ould] find no refuge in the doctrine of fair notice").

### III. THE COMMISSION'S TREATMENT OF LTD IS CONSISTENT WITH THAT OF OTHER APPLICANTS.

LTD asserts that the Bureau's review of its long-form application departed from how the Bureau reviewed all other long-form applications— except (notably) for Starlink's, which the Commission also denied. LTD Br. 50-53. Specifically, LTD contends that, because "all prior auction defaults at the long-form stage have resulted from a voluntary default by the winning bidder or a failure to submit necessary materials," *id*. at 44, LTD's application was subjected to a "heightened review" not applied to all "previous" long-form applications, *id.* at 51.

"To prevail upon a claim of disparate treatment," a petitioner "must demonstrate that the Commission's action was so inconsistent with its precedent as to constitute arbitrary treatment amounting to an abuse of discretion." *Lakeshore Broad., Inc. v. FCC*, 199 F.3d 468, 476 (D.C. Cir.

1999). Of course, as LTD acknowledges (LTD Br. 26), that was not the case with the Commission's denial of Starlink's long-form application. *See In re Application for Review of Starlink Services, LLC*, 2023 WL 8696905 (rel. Dec. 12, 2023). That denial, as LTD recognizes, was "[c]onsistent with" the agency's "approach to LTD's…application." LTD Br. 26.

In any event, the fact that other applications were denied on completeness grounds or voluntarily withdrawn did not divest the Commission of the power and obligation to examine LTD's application to determine whether the company was reasonably capable of fulfilling its public interest obligations. Further, all of the prior decisions that LTD cites were by the Commission's staff, LTD Br. 44-45, and it is "well-established…that an agency is not bound by the actions of its staff if the agency has not endorsed those actions." *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004); *see Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008), *SNR Wireless*, 868 F.3d at 1307. Those non-binding staff actions therefore cannot establish a legal standard that the Commission must apply to LTD's long-form application.

Next, LTD contends that it was treated differently because "other participants in the [Rural Digital Opportunity Fund] auction" were permitted "to default on some of their successful bids without penalty while still

receiving support for other of their successful bids." LTD Br. 51-52; *see*

*Rural Digital Opportunity Fund Support Authorized for 2,008 Winning Bids*,

36 FCC Rcd 17198, 17204-05 (WCB/OEA 2021) (waiver by Commission

staff of the requirement "that a default encompass the entire winning bid" for

certain applicants).

That argument fails because it also relies on an alleged inconsistency

between non-binding Bureau-level decisions and the Commission's decision

here. *Vernal Enters.,* 355 F.3d at 660. In any event, LTD is not similarly

situated to those winning bidders, who were permitted to default on bids in

areas where the Bureau had "concerns about whether funding those areas

would be the best use of universal service funds" because the areas may

already have had sufficient broadband service. *Two Applicants for Rural*

*Digital Opportunity Fund in Default*, 2023 WL 8643472 ¶ 7 (rel. Dec. 5,

2023); *see* 36 FCC Rcd at 17203. In those cases, the Bureau gave winning

bidders the option to default on bids in areas that already had broadband

service, while keeping winning bids in areas without broadband service.[11]

Here, LTD defaulted for an entirely different reason: The Bureau deemed

---

[11] *See* Federal Communications Commission, Letters to Long-Form
Applicants about Identified Census Blocks, https://www.fcc.gov/auction/904
(last visited Oct. 11, 2023) (providing letters under "Releases" tab and
"Letters" sub-tab) (Identified Census Block Letter).

LTD technically and financially unqualified to serve *all* of the areas covered by its winning bids. *Order* ¶ 42 (JA __); *see id.* ¶ 40 (explaining that LTD "failed to provide required specific and localized designs" and "instead…applied an unrealistic one-size-fits-all approach for the vast areas" that it would be required to serve) (JA __).

Finally, LTD's assertion that it was denied the "'iterative process'" provided other long-form applicants is contradicted by the record. LTD does not dispute that over the course of a year and a half, the Bureau repeatedly contacted LTD to discuss the "financial and technical deficiencies" in LTD's long-form application. *Order* ¶ 11 (JA ___); *id.* ¶ 41 (JA ___). LTD's contention that the Bureau "abruptly ended the long-form process" that had dragged on for months, LTD Br. 52, is thus groundless.

## IV. THE COMMISSION REASONABLY DENIED LTD'S LONG-FORM APPLICATION IN FULL.

The Commission in the *Order* reasonably affirmed the Bureau's denial of LTD's long-form application in its entirety. Before the Bureau, LTD never raised the possibility of partially granting its application, and "the Bureau had no basis to do so." *Order* ¶ 42 (JA __). Despite multiple requests from the Bureau, LTD never provided the state-specific technical and financial information required by the auction rules and procedures. *See August 10 Letter* 7-8 (JA ___); *Order* ¶¶ 34, 40 (JA ___). Instead, LTD took a "one-

size-fits-all" approach. *Order* ¶ 40 (JA ___). As a result, the Bureau had "no way to differentiate in which states LTD could potentially offer a better application than it had succeeded in doing after an extensive iterative process of revision." *Id.* ¶ 42 (JA ___). Especially given "the numerous unexplained or problematic aspects of its application," the Bureau's only option was to deny the entire long-form application. *Id.*

To be sure, as the Commission acknowledged, "certain other winning bidders" in the Rural Digital Opportunity Fund auction "were announced as ready-to-authorize in some states but not in others." *Id.* But as the Commission explained, in those cases, the partial authorizations were dependent on the timing of pending requests for Eligible Telecommunications Carrier designation, "rather than," as in LTD's case, "the assessed quality of the application." *Id.* LTD has not identified any instance where the Bureau announced a partial authorization because the applicant was deemed technically and financially qualified in some but not all of the states covered by its long-form application.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

JONATHAN S. KANTER
ASSISTANT ATTORNEY GENERAL

P. MICHELE ELLISON
GENERAL COUNSEL

ROBERT B. NICHOLSON
STEVEN J. MINTZ
ATTORNEYS

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

/s/ Maureen K. Flood

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

June 24, 2024

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒  this document contains <u>12,174</u> words, *or*

    ☐  this document uses a monospaced typeface and contains _ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365</u> in <u>14-point Times New Roman</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.

<u>/s/ Maureen K. Flood</u>

Maureen K. Flood
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

**CERTIFICATE OF FILING AND SERVICE**

I, Maureen K. Flood, hereby certify that on June 24, 2024, I filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

# Addendum

# Statutes and Regulations

**Table of Contents**

5 U.S.C. § 706...........................................................................................................1

47 U.S.C. § 214..........................................................................................................2

47 U.S.C. § 405..........................................................................................................5

47 C.F.R. § 54.804......................................................................................................7

# 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

   (1) compel agency action unlawfully withheld or unreasonably delayed; and

   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

      (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      (B) contrary to constitutional right, power, privilege, or immunity;

      (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

      (D) without observance of procedure required by law;

      (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

      (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# 47 U.S.C. § 214

***

(e) Provision of universal service

(1) Eligible telecommunications carriers

A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas

If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service

A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area" defined

The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

(6) Common carriers not subject to State commission jurisdiction
In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

# 47 U.S.C. § 405

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: Provided, That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

(b)(1) Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

(2) Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title.

(a) In addition to providing information specified in § 1.21001(b) of this chapter and any other information required by the Commission, any applicant to participate in competitive bidding for Rural Digital Opportunity Fund support shall:

(1) Provide ownership information as set forth in § 1.2112(a) of this chapter;

(2) Certify that the applicant is financially and technically qualified to meet the public interest obligations established for Rural Digital Opportunity Fund support;

(3) Disclose its status as an eligible telecommunications carrier to the extent applicable and certify that it acknowledges that it must be designated as an eligible telecommunications carrier for the area in which it will receive support prior to being authorized to receive support;

(4) Describe the technology or technologies that will be used to provide service for each bid;

(5) Submit any information required to establish eligibility for any bidding weights adopted by the Commission in an order or public notice;

(6) To the extent that an applicant plans to use spectrum to offer its voice and broadband services, demonstrate it has the proper authorizations, if applicable, and access to operate on the spectrum it intends to use, and that the spectrum resources will be sufficient to cover peak network usage and deliver the minimum performance requirements to serve all of the fixed locations in eligible areas, and certify that it will retain its access to the spectrum for the term of support;

(7) Submit operational and financial information.

(i) If applicable, the applicant should submit a certification that it has provided a voice, broadband, and/or electric transmission or distribution service for at least two years or that it is a wholly-owned subsidiary of such an entity, and specifying the number of years the applicant or its parent company has been operating, and submit the financial statements from the prior fiscal year that are audited by an independent certified public accountant. If the applicant is not audited in the ordinary course of business,

in lieu of submitting audited financial statements it must submit unaudited financial statements from the prior fiscal year and certify that it will provide financial statements from the prior fiscal year that are audited by an independent certified public accountant by a specified deadline during the long-form application review process.

(A) If the applicant has provided a voice and/or broadband service it must certify that it has filed FCC Form 477s as required during this time period.

(B) If the applicant has operated only an electric transmission or distribution service, it must submit qualified operating or financial reports that it has filed with the relevant financial institution for the relevant time period along with a certification that the submission is a true and accurate copy of the reports that were provided to the relevant financial institution.

(ii) If an applicant cannot meet the requirements in paragraph (a)(7)(i) of this section, in the alternative it must submit the audited financial statements from the three most recent fiscal years and a letter of interest from a bank meeting the qualifications set forth in paragraph (c)(2) of this section, that the bank would provide a letter of credit as described in paragraph (c) of this section to the bidder if the bidder were selected for bids of a certain dollar magnitude.

(8) Certify that the applicant has performed due diligence concerning its potential participation in the Rural Digital Opportunity Fund.

(b) Application by winning bidders for Rural Digital Opportunity Fund support—

(1) Deadline. As provided by public notice, winning bidders for Rural Digital Opportunity Fund support or their assignees shall file an application for Rural Digital Opportunity Fund support no later than the number of business days specified after the public notice identifying them as winning bidders.

(2) Application contents. An application for Rural Digital Opportunity Fund support must contain:

(i) Identification of the party seeking the support, including ownership information as set forth in § 1.2112(a) of this chapter;

(ii) Certification that the applicant is financially and technically qualified to meet the public interest obligations for Rural Digital Opportunity Fund support in each area for which it seeks support;

(iii) Certification that the applicant will meet the relevant public interest obligations, including the requirement that it will offer service at rates that are equal or lower to the Commission's reasonable comparability benchmarks for fixed wireline services offered in urban areas;

(iv) A description of the technology and system design the applicant intends to use to deliver voice and broadband service, including a network diagram which must be certified by a professional engineer. The professional engineer must certify that the network is capable of delivering, to at least 95 percent of the required number of locations in each relevant state, voice and broadband service that meets the requisite performance requirements for Rural Digital Opportunity Fund support;

(v) Certification that the applicant will have available funds for all project costs that exceed the amount of support to be received from the Rural Digital Opportunity Fund for the first two years of its support term and that the applicant will comply with all program requirements, including service milestones;

(vi) A description of how the required construction will be funded, including financial projections that demonstrate the applicant can cover the necessary debt service payments over the life of the loan, if any;

(vii) Certification that the party submitting the application is authorized to do so on behalf of the applicant; and

(viii) Such additional information as the Commission may require.

(3) Letter of credit commitment letter. No later than the number of days provided by public notice, the long-form applicant shall submit a letter from a bank meeting the eligibility requirements outlined in paragraph (c) of this section committing to issue an irrevocable stand-by letter of credit, in the required form, to the long-form applicant. The letter shall at a minimum provide the dollar amount of the letter of credit and the issuing bank's agreement to follow the terms and conditions of the Commission's model letter of credit.

(4) Audited financial statements. No later than the number of days provided by public notice, if a long-form applicant or a related entity did not submit audited financial statements in the relevant short-form application as required, the long-form applicant must submit the financial statements from the prior fiscal year that are audited by an independent certified public accountant.

(5) Eligible telecommunications carrier designation. No later than 180 days after the public notice identifying it as a winning bidder, the long-form applicant shall certify that it is an eligible telecommunications carrier in any area for which it seeks support and submit the relevant documentation supporting that certification.

(6) Application processing.

   (i) No application will be considered unless it has been submitted in an acceptable form during the period specified by public notice. No applications submitted or demonstrations made at any other time shall be accepted or considered.

   (ii) Any application that, as of the submission deadline, either does not identify the applicant seeking support as specified in the public notice announcing application procedures or does not include required certifications shall be denied.

   (iii) An applicant may be afforded an opportunity to make minor modifications to amend its application or correct defects noted by the applicant, the Commission, the Administrator, or other parties. Minor modifications include correcting typographical errors in the application and supplying non-material information that was inadvertently omitted or was not available at the time the application was submitted.

   (iv) Applications to which major modifications are made after the deadline for submitting applications shall be denied. Major modifications include, but are not limited to, any changes in the ownership of the applicant that constitute an assignment or change of control, or the identity of the applicant, or the certifications required in the application.

   (v) After receipt and review of the applications, a public notice shall identify each long-form applicant that may be authorized to receive Rural Digital

Opportunity Fund support after the long-form applicant submits a letter of credit and an accompanying opinion letter as described in paragraph (c) of this section, in a form acceptable to the Commission. Each such long-form applicant shall submit a letter of credit and accompanying opinion letter as required by paragraph (c) of this section, in a form acceptable to the Commission no later than the number of business days provided by public notice.

(vi) After receipt of all necessary information, a public notice will identify each long-form applicant that is authorized to receive Rural Digital Opportunity Fund support.

(c) Letter of credit. Before being authorized to receive Rural Digital Opportunity Fund support, a winning bidder shall obtain an irrevocable standby letter of credit which shall be acceptable in all respects to the Commission.

(1) Value. Each recipient authorized to receive Rural Digital Opportunity Fund support shall maintain the standby letter of credit in an amount equal to, at a minimum, one year of support, until the Universal Service Administrative Company has verified that the recipient has served 100 percent of the Connect America Cost Model-determined location total (or the adjusted Connect America Cost Model location count if there are fewer locations) by the end of year six.

(i) For year one of a recipient's support term, it must obtain a letter of credit valued at an amount equal to one year of support.

(ii) For year two of a recipient's support term, it must obtain a letter of credit valued at an amount equal to eighteen months of support.

(iii) For year three of a recipient's support term, it must obtain a letter of credit valued at an amount equal to two years of support.

(iv) For year four of a recipient's support term, it must obtain a letter of credit valued at an amount equal to three years of support.

(v) A recipient may obtain a new letter of credit or renew its existing letter of credit so that it is valued at an amount equal to one year of support once it meets its optional or required service milestones. The recipient may obtain or renew this letter of credit upon verification of its buildout by the

Universal Service Administrative Company. The recipient may maintain its letter of credit at this level for the remainder of its deployment term, so long as the Universal Service Administrative Company verifies that the recipient successfully and timely meets its remaining required service milestones.

(vi) A recipient that fails to meet its required service milestones must obtain a new letter of credit or renew its existing letter of credit at an amount equal to its existing letter of credit, plus an additional year of support, up to a maximum of three years of support.

(vii) A recipient that fails to meet two or more required service milestones must maintain a letter of credit in the amount of three year of support and may be subject to additional non-compliance penalties as described in § 54.320(d).

(2) Bank eligibility. The bank issuing the letter of credit shall be acceptable to the Commission. A bank that is acceptable to the Commission is:

(i) Any United States bank

(A) That is insured by the Federal Deposit Insurance Corporation, and

(B) That has a bank safety rating issued by Weiss of B- or better; or

(ii) CoBank, so long as it maintains assets that place it among the 100 largest United States Banks, determined on basis of total assets as of the calendar year immediately preceding the issuance of the letter of credit and it has a long-term unsecured credit rating issued by Standard & Poor's of BBB- or better (or an equivalent rating from another nationally recognized credit rating agency); or

(iii) The National Rural Utilities Cooperative Finance Corporation, so long as it maintains assets that place it among the 100 largest United States Banks, determined on basis of total assets as of the calendar year immediately preceding the issuance of the letter of credit and it has a long-term unsecured credit rating issued by Standard & Poor's of BBB- or better (or an equivalent rating from another nationally recognized credit rating agency); or

(iv) Any non–United States bank:

(A) That is among the 100 largest non–U.S. banks in the world, determined on the basis of total assets as of the end of the calendar year immediately preceding the issuance of the letter of credit (determined on a U.S. dollar equivalent basis as of such date);

(B) Has a branch office:

(1) Located in the District of Columbia; or

(2) Located in New York City, New York, or such other branch office agreed to by the Commission, that will accept a letter of credit presentation from the Administrator via overnight courier, in addition to in-person presentations;

(C) Has a long-term unsecured credit rating issued by a widely-recognized credit rating agency that is equivalent to a BBB- or better rating by Standard & Poor's; and

(D) Issues the letter of credit payable in United States dollars

(3) Bankruptcy opinion letter. A long-form applicant for Rural Digital Opportunity Fund support shall provide with its letter of credit an opinion letter from its legal counsel clearly stating, subject only to customary assumptions, limitations, and qualifications, that in a proceeding under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), the bankruptcy court would not treat the letter of credit or proceeds of the letter of credit as property of the winning bidder's bankruptcy estate under section 541 of the Bankruptcy Code.

(4) Non-compliance. .Authorization to receive Rural Digital Opportunity Fund support is conditioned upon full and timely performance of all of the requirements set forth in this section, and any additional terms and conditions upon which the support was granted.

(i) Failure by a Rural Digital Opportunity Fund support recipient to meet its service milestones for the location totals determined by the Connect America Cost Model, or the location total that is adjusted by the Wireline Competition Bureau for those areas where there are fewer locations than the number of locations determined by the Connect America Cost Model, as

required by § 54.802 will trigger reporting obligations and the withholding of support as described in § 54.320(d). Failure to come into full compliance during the relevant cure period as described in §§ 54.320(d)(1)(iv)(B) or 54.320(d)(2) will trigger a recovery action by the Universal Service Administrative Company as described in § 54.320(d)(1)(iv)(B) or § 54.806(c)(1)(i), as applicable. If the Rural Digital Opportunity Fund recipient does not repay the requisite amount of support within six months, the Universal Service Administrative Company will be entitled to draw the entire amount of the letter of credit and may disqualify the Rural Digital Opportunity Fund support recipient from the receipt of Rural Digital Opportunity Fund support or additional universal service support.

(ii) The default will be evidenced by a letter issued by the Chief of the Wireline Competition Bureau, or its respective designees, which letter, attached to a standby letter of credit draw certificate, shall be sufficient for a draw on the standby letter of credit for the entire amount of the standby letter of credit.