# United States Court of Appeals
#### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 24-1017                                                        September Term, 2024

FILED ON: JUNE 3, 2025

LTD BROADBAND, LLC,
        PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,
        RESPONDENTS

On Petition for Review of an Order
of the Federal Communications Commission

Before: RAO and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*

### J U D G M E N T

We heard this appeal on the record from the Federal Communications Commission and the parties' briefs and arguments. We fully considered the issues and determined that a published opinion is unnecessary. *See* D.C. Cir. R. 36(d). It is

**ORDERED AND ADJUDGED** that the petition be **DENIED**.

\*     \*     \*

The Federal Communications Commission allocates subsidies to private companies that promise to build out rural broadband networks. At a reverse auction, petitioner LTD Broadband won nearly $1.3 billion of these subsidies. But before LTD could collect, it had to complete a "long-form application" showing it was "legally, technically, and financially qualified" to provide service. *In re Rural Digital Opportunity Fund; Connect America Fund*, Report and Order, 35 FCC Rcd. 686, 717 (2020) ("Rural Digital Opportunity Fund"). LTD failed to do so, and the FCC denied its application.

Because the FCC acted reasonably, we deny LTD's petition.

# I

In 2020, the FCC established the Rural Digital Opportunity Fund to help roll out high-speed internet to unserved communities across the nation. In the Fund's first phase, the FCC allocated $16 billion in subsidies through a reverse auction. To participate in that auction, private broadband providers had to submit short-form applications to show that they would be "serious" bidders. *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 719.

Once approved, broadband providers could bid and win funds to build out rural broadband networks. But before successful bidders could collect on their winnings, they had to submit long-form applications. Those applications facilitate the FCC's "in-depth extensive review" of the winning bidders' qualifications to provide service in the specific areas where they won. *Id.* at 722.

LTD Broadband is a small midwestern broadband provider. As of early 2020, it served approximately 15,000 customers across just a few states.

Later that year, LTD submitted a short-form application to participate in the Fund's Phase I auction. The FCC's Wireline Competition Bureau deemed LTD "reasonably capable" of providing service, so LTD qualified to participate. *Rural Digital Opportunity Fund Phase I; Notice and Filing Requirements and Other Procedures for Auction*, Public Notice, 35 FCC Rcd. 6077, 6109, 6124 (2020) ("Auction Procedures Notice"). Having cleared the short-form application process, LTD bid aggressively in the auction.

LTD won, big time. It was awarded $1.3 billion to serve more than half a million locations across 15 states. But that award was conditional on LTD's successful completion of the long-form application process.

After more than a year of back-and-forth with the agency, LTD failed to satisfy the Bureau that it was reasonably capable of performing on its substantial auction winnings. So the Bureau denied LTD's long-form application. And without any noted dissents, the FCC subsequently denied LTD's application for review of the Bureau's decision.

LTD then petitioned for review in this court.

# II

We disagree with each of the four arguments presented by LTD's petition.

## A

LTD's lead argument is that the FCC did not follow its own rules. LTD reads the FCC's rules to require only minimal review to make sure long-form applications are complete and that applicants' plans have been endorsed by independent experts. Because the FCC instead subjected

2

LTD's long-form application to "a deeply probing and skeptical standard of review," LTD says the FCC's denial of that application was arbitrary and capricious. Petitioner Br. 39.

We disagree with LTD's premise: The auction rules do not limit the FCC to checking long-form applications for completeness and endorsement by experts.

To be sure, a long-form applicant must submit a complete application. *See* 47 C.F.R. § 54.804(b)(6)(ii) (applications that fail to "identify the applicant" or that lack "required certifications shall be denied"). But that requirement is only necessary, not sufficient. The long-form application process is designed to allow the agency to conduct an "*in-depth extensive* review of the winning bidders' qualifications," *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 722 (emphasis added) — far "more than a ministerial, box-checking exercise," *In re Application for Review of LTD Broadband; Denial of Application for Rural Digital Opportunity Fund*, Order on Review, 38 FCC Rcd. 11697, 11703 (2023).

By regulation, a complete long-form application package "must contain" a number of detailed materials. *See* 47 C.F.R. § 54.804(b)(2).

- <u>Ownership Disclosure</u>: Applicants must disclose detailed corporate ownership information. *Id.* § 54.804(b)(2)(i); *see id.* § 1.2112(a) (beneficial ownership details required).

- <u>Certifications</u>: Applicants must certify that (a) they are "financially and technically qualified," (b) they "will meet the relevant public interest obligations," (c) they "will have available funds for all project costs" in excess of Fund subsidies for the first two years, (d) they "will comply with all program requirements, including service milestones," and (e) that "the party submitting the application is authorized to do so on behalf of the applicant." *Id.* § 54.804(b)(2)(ii), (iii), (v), (vii).

- <u>Description of Technology & System Design</u>: Applicants must describe, in technical terms, precisely *how* they plan to provide broadband service, and each must provide "a network diagram which must be certified by a professional engineer." *Id.* § 54.804(b)(2)(iv).

- <u>Funding & Projected Financials</u>: Applicants must say "how the required construction will be funded" and provide "financial projections" that "demonstrate" their ability to service any debt that they take on. *Id.* § 54.804(b)(2)(vi).

- <u>Bank Commitment Letter</u>: Applicants must "submit a letter from a bank . . . committing to issue an irrevocable stand-by letter of credit." *Id.* § 54.804(b)(3).

- <u>Audited Historical Financials</u>: If they did not do so at the short-form stage, applicants "must submit the[ir] financial statements from the prior fiscal year that are audited by an independent certified public accountant." *Id.* § 54.804(b)(4).

- <u>Documentation for Eligible Telecom Carrier Designation</u>: Under the Communications Act, only a company that is designated "an eligible telecommunications carrier" by the relevant state can receive universal service funds. *See* 47 U.S.C. § 254(e). So, for each state in which a long-form applicant wins support, the applicant must certify and show that it has the required designation. 47 C.F.R. § 54.804(b)(5).

On top of this, the regulation requires each long-form applicant to provide "[s]uch *additional* information as the Commission may require," *id.* § 54.804(b)(2)(viii) (emphasis added), in "determin[ing] whether [the] applicant is reasonably capable of meeting its Rural Digital Opportunity Fund auction obligations in the specific areas where it has winning bids," *Rural Digital Opportunity Fund Phase I; Notice and Filing Requirements and Other Procedures for Auction*, Public Notice, 35 FCC Rcd. 6077, 6098-99 (2020) ("Auction Procedures Notice"). In other words, the regulation contemplates requests for additional information that the FCC deems necessary in the course of its review.

LTD suggests that the point of long-form application materials is to allow the FCC to "rely on" the "considered judgment" of others: "the bank, the engineer, and the applicant itself." Petitioner Reply Br. 8-10, 1. In other words, the FCC must "trust the expert[s]" and apply a light-touch, deferential standard of review. *See* Petitioner Br. 35-36 (FCC must "trust the expertise of the bank" and "trust the independent judgment and expertise of an engineer"). Besides, says LTD, the FCC's own guidance says the agency will review only whether long-form applicants are "*reasonably* capable" of fulfilling their obligations, and "reasonableness review is deferential." *Id.* at 32 (quoting JA 96-97) (emphasis added).

Though LTD's argument was ably presented, we are not persuaded. The FCC is itself an expert, and it never promised to abdicate all its decision-making to other experts. Rather, the FCC told applicants to submit "extensive information" at the long-form stage, alerted applicants to the possibility of open-ended follow-up requests, and required them to "demonstrat[e]" their qualifications. *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 717 ("After the auction, winning bidders must file more extensive information for the long-form application, demonstrating to the Commission that they are legally, technically and financially qualified to receive support.").

True, the regulation itself says little about the specifics of the FCC's review process or its standard of review. It states only that the FCC will receive and "review" each application before authorizing the applicant to receive Fund support. *See* 47 C.F.R. § 54.804(b)(6)(v). And in itself, the word "review" does not imply any particular level of scrutiny.

But in context, "review" means more than ticking through an application for completeness and relying entirely on the say-so of others. In addition to requiring a commitment letter from a bank and a network diagram certified by a professional engineer, the regulation also requires audited financials and funding details, plus broader information about the applicant's technology and system design. *See id.* § 54.804(b)(2)(iv), (vi); *id.* § 54.804(b)(3); *id.* § 54.804(b)(4). Those requirements would not make much sense if the bank's financial assurances and the engineer's technical imprimatur alone were enough to satisfy the FCC's review.

4

The FCC's guidance in promulgating the Fund's auction rules bolsters this conclusion. The guidance says that long-form applications will be subject to "in-depth," "extensive," and "thorough" "evaluat[ion]" and "scrutin[y]."[1] That does not describe a light-touch, deferential review.[2]

**B**

LTD says that the FCC failed to "provide fair notice of what will and will not result in default" under a "vague and open-ended" standard. Petitioner Br. 49, 47.

Again, we disagree. The FCC gave LTD fair notice. "[B]y reviewing the regulations and other public statements issued by the agency," LTD should have been "able to identify, with

---

[1] *See Rural Digital Opportunity Fund*, 35 FCC Rcd. at 722 ("*in-depth extensive* review of the winning bidders' qualifications" (emphasis added)); *see also, e.g.*, *Auction Procedures Notice*, 35 FCC Rcd. at 6098-99 ("Commission staff will *evaluate* the information submitted in the long-form application . . . ." (emphasis added)); *id.* at 6168 ("long-form applicant [may] be asked to provide further details about its proposed network" to address FCC concerns about its "technical qualifications"); *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 721 ("*thorough* financial and technical review" (emphasis added)); *id.* at 722 ("audited financial statements . . . . will allow us to *scrutinize*" their financial status (emphasis added)).

[2] LTD points to statements that support will be awarded "[a]fter a long-form applicant's application . . . is considered to be complete," but those isolated statements must be read in the context of the FCC's other guidance. *See* Petitioner's Br. 36-37 (quoting *Auction Procedures Notice*, 35 FCC Rcd. at 6164, and citing *id.* at 6177). As to LTD's argument that the phrase "reasonably capable" is evidence of a deferential "reasonableness review," Petitioner Br. 32, as the FCC explains, that phrase "specifies what a long-form applicant must show in its application, not how the [FCC] must evaluate its application," Respondent Br. 32.

More broadly, LTD suggests that the FCC made a "deliberate policy choice" to dish out substantial funds — $16 billion — with limited up-front screening to "expedite" rural broadband rollout, while relying only on stiff back-end enforcement to deter unqualified bidders and to recover any squandered funds. *See* Petitioner Br. 34. No doubt, the FCC calibrated its approach to balance competing interests, but for better or worse, the balance that the FCC struck was between the short-form and long-form application processes. The FCC erred on the side of including more bidders at the short-form stage, with the understanding that the long-form stage would allow the agency to weed out any winners who later proved unqualified to take on all of their winnings. *See, e.g.*, *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 721-22 (weighing the agency's "interest in maximizing participation in the . . . auction" against the "potential risk of qualifying a less experienced entity," and concluding that rigorous scrutiny at the long-form stage adequately addresses that risk); *see also, e.g.*, *Auction Procedures Notice*, 35 FCC Rcd. at 6089 ("The Commission's determination that an applicant is qualified to participate in [the] Auction . . . does not guarantee that the applicant will also be deemed qualified to receive support if it becomes a winning bidder. In the second phase of the process, each winning bidder . . . must file a *more comprehensive* long-form application . . . , which the Commission will review *to determine* if the applicant should be authorized to receive support for the winning bids." (emphases added)); *id.* at 6098-99 (similar).

5

ascertainable certainty, the standards with which the agency expects parties to conform." *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (cleaned up).

That's because, alongside the Fund's auction rules, the FCC issued guidance about the details that long-form applicants like LTD would be "expected to" include in their descriptions of technology and system design, and the specific costs and projections that "should [be] include[d]" in their funding description. *See Auction Procedures Notice*, 35 FCC Rcd. at 6167-75. And as discussed above, the FCC made clear up front that the applications would be subject to "in-depth extensive review," which could also involve follow-up requests. *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 722; *see* 47 C.F.R. § 54.804(b)(2)(viii). For applicants that failed at this stage in the process, the FCC made no secret of the consequences: default and forfeiture penalties.[3]

In reviewing LTD's long-form application, the FCC engaged with LTD about various "insufficiencies" that the agency encountered. *In re Application for Review of LTD Broadband*, 38 FCC Rcd. at 11701. FCC staff "spoke with LTD" multiple times for a year and a half and "answered LTD's questions regarding program requirements." *Id.* at 11700-01. Then, the FCC gave LTD one last chance: Before declaring the company in default, the FCC sent LTD a letter "extensively detailing" its concerns and explaining what LTD needed to do. *Id.* at 11701.

All this adequately afforded LTD fair notice of what the FCC expected of it. *See Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 220 (D.C. Cir. 2022) ("afford[ing] a chance to cure . . . typically provides adequate notice" (cleaned up)).

## C

Next, LTD says the FCC treated it differently than other similarly situated bidders in three ways. *First*, LTD says the FCC arbitrarily singled it out for heightened review because of the "scope, scale, and size" of its winning bids. Petitioner Br. 5, 51. *Second*, LTD says the FCC allowed other bidders to default in part without penalty, while it declined to do so for LTD. *Third*, LTD says the FCC "abruptly ended the long-form process with LTD," whereas other "applications were granted after an 'iterative process.'" *Id.* at 52 (cleaned up).

We disagree.

*First*, the FCC subjected LTD's application to unusual scrutiny only because LTD's application *was* unusual. As the biggest winner at the auction and a relatively small company, LTD was aspiring to do far more than it had ever done. The FCC thus had reason to wonder whether LTD was up to the task. *See Intellistop Inc. v. United States Department of*

---

[3] *Rural Digital Opportunity Fund*, 35 FCC Rcd. at 736 ("As a condition of participating in the Rural Digital Opportunity Fund auction, entities will acknowledge that they are subject to a forfeiture in the event of an auction default. . . . [W]e will impress upon recipients the importance of being prepared to meet all our requirements for the post-selection review process, and emphasize the requirement that they . . . ensure that they are qualified to participate . . . ." (cleaned up)).

6

*Transportation*, 72 F.4th 344, 351 (D.C. Cir. 2023) ("we have often held that agencies must provide an adequate explanation to justify treating similarly situated parties differently, but an agency does not act arbitrarily if it treats dissimilar parties differently" (cleaned up)).[4]

*Second*, with regard to default penalties, the FCC reasonably treated "dissimilar parties differently." *Id.* Reasoning that it would be wasteful to subsidize duplicative broadband service in areas that already enjoyed adequate broadband service, the FCC decided to encourage bidders to drop their government-funded projects in those areas; the FCC did so by indicating that it would look kindly on bidders' requests for waivers from default penalties in such circumstances. *See* Federal Communications Commission, Letters to Long-Form Applicants about Identified Census Blocks, fcc.gov/auction/904.[5] LTD, by contrast, defaulted for a different reason: It was not reasonably capable of providing service and had not secured the requisite designations of eligibility.

*Third*, the record does not support LTD's contention that the FCC ended its engagement with LTD more abruptly than with other bidders. LTD received the same iterative process as other bidders: After a year and a half of fruitless back-and-forth, the FCC gave LTD one last chance to cure its deficiencies. *See In re Application for Review of LTD Broadband*, 38 FCC Rcd. at 11700-01. When LTD failed to do so after yet another round of back-and-forth, the FCC denied its application. *See id.* at 11702.

**D**

Finally, LTD says that the FCC unreasonably denied the company all of its auction winnings instead of selectively denying the winnings only in part. But there is not a sufficient basis in the record for the FCC to distinguish between specific areas where LTD was and was not financially and technically prepared to provide service. Thus, the FCC's across-the-board denial was not arbitrary and capricious.

**III**

For these reasons, we **DENY** the petition for review.

---

[4] Dissenting from the FCC's denial of the long-form application of a *different* auction winner, Starlink Services, LLC, Commissioner Carr pointedly observed that the agency "ma[de] up an entirely new standard of review . . . and then appl[ied] that novel standard to only one entity: Starlink." Starlink Application for Review Denial, Dissenting Statement of Commissioner Brendan Carr, at 1, *available at* perma.cc/6USX-DDVQ. But LTD's case is not like Starlink's. In Commissioner Carr's view, Starlink's disparate treatment was motivated by (1) the Biden Administration's political animus towards Elon Musk, and (2) unwarranted agency skepticism about low-earth-orbit satellite technology — neither of which is relevant to LTD. *Id.* at 1-2. Underscoring that difference is the FCC's unanimity in its LTD decision.

[5] These letters are available under "Releases" and then "Letters" at the URL above. LTD's letter is available here: perma.cc/4J47-D4JE.

7

\* \* \*

This disposition is unpublished. *See* D.C. Cir. R. 36(d). We direct the Clerk to withhold this mandate until seven days after resolution of a timely petition for panel or en banc rehearing. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

**<u>Per Curiam</u>**

                                         **FOR THE COURT:**
                                         Clifton B. Cislak, Clerk

BY:   /s/
        Daniel J. Reidy
        Deputy Clerk